**GREATER DETROIT RESOURCE RECOVERY AUTHORITY and Combustion Engineering, Plaintiffs–Appellees,**

v.

**The UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al., Defendants–Appellants.**

No. 88–2269.

United States Court of Appeals,
Sixth Circuit.

Argued Sept. 22, 1989.

Decided Aug. 30, 1990.

318

John D. Pirich, Noah Eliezer Yanich, Steven D. Weyhing (argued), Miller, Canfield, Paddock & Stone, Lansing, Mich., for Greater Detroit Resource Recovery Authority.

Stanley M. Gorinson, Pillsbury, Madison & Sutro, Washington, D.C., C. Douglas Floyd (argued), Pillsbury, Madison & Sutro, San Francisco, Cal., for Combustion Engineering, Inc.

Michael M. Wenig, Thomas R. Lotterman, U.S. Dept. of Justice Land & Natural Resources Div., Washington, D.C., Gregory B. Foote, E.P.A. Air & Radiation Div., Washington, D.C., for Valdas V. Adamkus, Regional Administrator, Region V.

Michael M. Wenig, Thomas R. Lotterman, Peter R. Steenland (argued), J. Carol Williams, U.S. Dept. of Justice Land & Natural Resources Div., Gregory B. Foote, Washington, D.C., for U.S. E.P.A.

Before MERRITT, Chief Judge, KRUPANSKY, Circuit Judge, and GRAHAM, District Judge.*

GRAHAM, District Judge.

Defendant-appellant, the United States Environmental Protection Agency (EPA), appeals from the order of the United States District Court for the Eastern District of Michigan awarding attorney's fees under the Equal Access to Justice Act, 28 U.S.C. § 2412. This litigation involves a municipal solid waste incinerator and steam generating plant owned by the Greater Detroit Resource Recovery Authority (GDRRA), a public body created by the cities of Detroit and Highland Park, Michigan. Plaintiffs-appellees are the GDRRA and Combustion Engineering, Inc., the contractor GDRRA retained to construct and operate the facility.

The Michigan Department of Natural Resources (MDNR), acting pursuant to authority delegated to it by EPA, granted Combustion Engineering a permit to construct the facility. GDRRA then issued bonds in the amount of $438,000,000 to finance the construction. Thereafter, EPA raised questions about the validity of the permit, specifically, whether MDNR had followed proper procedures in determining whether the facility's sulfur dioxide emissions were subject to the best available control technology (BACT). Construction of the facility began on May 9, 1986. On May 20, 1986, EPA notified MDNR by letter that it had made a provisional determination that the State of Michigan had not followed proper procedures with respect to the GDRRA permit and that it was revoking its delegation of authority to MDNR for the purpose of instituting proceedings to revoke the permit.

On July 7, 1986, appellees instituted this litigation seeking a declaration that the EPA had exceeded its authority in attempting to revoke the GDRRA permit, and further seeking to enjoin the EPA from any future attempt to do so. The district court established an expedited schedule for discovery and the case was submitted on cross motions for summary judgment. One week prior to the scheduled oral argument on the motions, the EPA withdrew its May 20, 1986 letter, stating that based on the facts then known to it, it had no grounds to proceed with efforts to revoke the GDRRA permit. EPA then requested that the court dismiss the lawsuit as moot. In an opinion dated October 21, 1986, the district court found that the relief sought by the appellees was not moot because EPA refused to acknowledge the validity of the permit. The court then enjoined the EPA from attempting to revoke the permit based on any evidence known or discovered as of that date. EPA did not appeal that order. Thereafter, appellees moved for costs and attorney's fees under Fed.R.Civ.P. 11 and the Equal Access to Justice Act, 28 U.S.C. § 2412. The district court found that the EPA was liable for attorney's fees and expenses under the bad faith exception to the American Rule and granted appellees' motions for attorney's fees and expenses under 28 U.S.C. § 2412(b). The district court awarded $161,365.62 to GDRRA and $269,193.01 to Combustion Engineering.

The EPA contends *inter alia* that the district court's award of attorney's fees and expenses must be reversed because the court did not have subject matter jurisdiction over this litigation.

The standard of review on the issue of subject matter jurisdiction is *de novo* review. *See Hilliard v. United States Postal Service*, 814 F.2d 325 (6th Cir.1987). Furthermore, "every federal appellate court has a special obligation to 'satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review'." *Bender v. Williamsport Area School District*, 475 U.S. 534, 541, 106 S.Ct. 1326, 1331, 89 L.Ed.2d 501 (1986), *quoting Mitchell v. Maurer*, 293 U.S. 237, 244, 55 S.Ct. 162, 165, 79 L.Ed. 338 (1934).

---

* The Honorable James L. Graham, United States District Judge for the Southern District of Ohio, sitting by designation.

■ Unless the statute under which a party seeks attorney's fees contains an independent grant of jurisdiction, an appellate court must vacate an award of attorney's fees if the district court did not have subject matter jurisdiction over the litigation. *Latch v. United States*, 842 F.2d 1031, 1033 (9th Cir.1988). The Equal Access to Justice Act, 28 U.S.C. § 2412, does not contain an independent grant of jurisdiction, but instead specifically requires subject matter jurisdiction as one of the predicates of an award of attorney's fees. Under 28 U.S.C. § 2412(b) a court may award reasonable fees and expenses to the prevailing party in any civil action brought by or against the United States "in any court having jurisdiction of such action." The phrase "jurisdiction of such action" refers to subject matter jurisdiction, and the language of the statute requires an independent examination of that issue when a court undertakes consideration of an award of attorney's fees even though the parties may not have contested that issue in the original proceedings or, as here, declined to appeal an earlier finding on that issue. *See Lane v. United States*, 727 F.2d 18 (1st Cir.1984); *Antosh v. Federal Election Commission*, 664 F.Supp. 5 (D.D.C.1987).

Two months after this litigation was commenced, the regional administrator of Region V, EPA issued a second letter dated September 19, 1986 rescinding the letter of May 20, 1986, in which he stated, "Despite my very grave concerns regarding the sulfur dioxide best available control technology decision made by the State of Michigan for the Detroit facility, there is an insufficient basis for U.S. EPA to go forward with any action to revoke the ... permit." Thereafter, the government offered to settle the litigation by stipulating that EPA considered the permit and the Michigan BACT determination to be valid based on the known facts, but the EPA would not agree to a consent decree. The judgment rendered by the district court enjoined the EPA from any

> action or attempt to revoke this permit on the basis solely of any evidence now discovered and facts known as of this date. This order does not preclude the EPA, based on additional evidence previously not available, new information, and/or new legislation, from doing what is appropriate or required at that time.

Since the court's order granted no more relief than the EPA had offered to stipulate, it logically decided not to appeal the district court's judgment.

■ In light of the procedural history of this case and the express language of 28 U.S.C. § 2412(b), we reject appellees' argument that principles of res judicata or collateral estoppel preclude appellant from raising the issue of subject matter jurisdiction. Thus, our review of the district court's award of attorney's fees under 28 U.S.C. § 2412(b) begins with the question of whether or not the district court had subject matter jurisdiction over the underlying action.

This litigation had its genesis in the EPA's performance of its functions under the Clean Air Act, 42 U.S.C. § 7401 *et seq.* which establishes a combined federal and state program to control air pollution. Under this Act, the EPA promulgates national air quality standards and each state is required to develop and submit to EPA for approval a state implementation plan that provides for the attainment and maintenance of those standards. 42 U.S.C. §§ 7410(a)(1) and (2). In 1977, Congress added provisions to the Act which included a program for the prevention of significant deterioration (PSD) of air quality. 42 U.S.C. §§ 7470–7479. The PSD program is implemented through a preconstruction review and permitting procedure applicable to major emitting facilities. The permit, in turn, requires the application of the best available control technology. 42 U.S.C. §§ 7475(a)(3) and (4). A state is required to include a PSD permit program in its state implementation plan. 42 U.S.C. § 7410(a)(2)(D). If a state has failed to submit an approved PSD program, the EPA may nevertheless delegate its permit issuing authority to the state. 42 U.S.C. § 7410(c)(3); 40 C.F.R. § 52.21(u). Permits issued under such a delegation are con-

sidered to be EPA issued permits. *See* 45 Fed.Reg. 33,413 (1980).

The EPA has not approved a PSD program for inclusion in Michigan's state implementation plan. In 1979, however, the EPA executed a written agreement delegating its PSD permitting authority to MDNR. That agreement provided for whole or partial revocation of the delegation if Michigan failed to properly implement the PSD program. It is within this regulatory framework that the MDNR issued a permit to the GDRRA, and it was the EPA's revocation of its delegation of PSD authority with respect to that permit which generated this litigation.

In 1977, Congress amended § 307(b)(1) of the Clean Air Act, 42 U.S.C. § 7607(b)(1), so as to vest jurisdiction in the United States courts of appeals to review certain specified actions of the Administrator of the EPA and "any other final action of the Administrator under [the Act] ... which is locally or regionally applicable." In *Harrison v. PPG Industries, Inc.*, 446 U.S. 578, 100 S.Ct. 1889, 64 L.Ed.2d 525 (1980), the Supreme Court held that this amendment vested the courts of appeals with jurisdiction to review any and all final actions of the EPA under the Clean Air Act.

■ It is a well settled principle that where Congress establishes a special statutory review procedure for administrative action, that procedure is generally the exclusive means of review for those actions. *Louisville and Nashville R. Co. v. Donovan*, 713 F.2d 1243, 1246 (6th Cir.1983), *cert. denied*, 466 U.S. 936, 104 S.Ct. 1908, 80 L.Ed.2d 457 (1984). Accordingly, most circuits have held that the courts of appeals have exclusive jurisdiction to review actions of the Administrator of the EPA. *See Mountain States Legal Foundation v. Costle*, 630 F.2d 754, 757 (10th Cir.1980), *cert. denied*, 450 U.S. 1050, 101 S.Ct. 1770, 68 L.Ed.2d 246 (1981). This court so held even prior to the 1977 amendments. *See Lubrizol Corp. v. Train*, 547 F.2d 310 (6th Cir.1976). That position was reaffirmed in *Motor Vehicle Manufacturers Association v. Costle*, 647 F.2d 675, 677 (6th Cir.), *cert. denied*, 451 U.S. 907, 101 S.Ct. 1975, 68

L.Ed.2d 295 (1981). In the latter case, this court specifically held that review of the EPA's adoption of a performance warranty regulation under the Clean Air Act was not authorized under the Mandamus Act, the Declaratory Judgment Act, or a district court's federal question jurisdiction. *Id.* at 677, n. 3. We held instead that "[a]ctions for declaratory relief or to enjoin the enforcement of a performance warranty regulation must be brought in the United States Court of Appeals for the District of Columbia." *Id.* at 678.

The Court of Appeals for the District of Columbia Circuit aptly noted in *Telecommunications Research and Action Center v. Federal Communications Commission*, 750 F.2d 70, 78 (D.C.Cir.1984):

> Furthermore, there are compelling policy reasons for holding that the jurisdiction of the Court of Appeals is exclusive. Appellate courts develop an expertise concerning the agencies assigned them for review. Exclusive jurisdiction promotes judicial economy and fairness to the litigants by taking advantage of that expertise. In addition, exclusive jurisdiction eliminates duplicative and potentially conflicting review, *Investment Co. Institute [v. Board of Governors]*, 551 F.2d [1270] at 1279 [D.C.Cir.1977], and the delay and expenses incidental thereto.

The district court based its exercise of jurisdiction on a finding of final agency action and the statutory authority for subject matter jurisdiction under 28 U.S.C. § 1337. In regard to the finality of the agency action, the district court stated at page 14 of the memorandum opinion and order of October 21, 1986:

> The first prong of the Abbott test [*Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)] requires final agency action which defendants' claim is lacking. This court finds that final agency action occurred on November 9, 1984, when the EPA through its delegation of authority granted a permit to C–E.

The granting of the permit may have been final agency action, but it was certainly not the agency action complained of by the

appellees. Rather, appellees objected to the May 20, 1986 action of the EPA revoking its delegation of permit authority with respect to the GDRRA facility. The district court never addressed the question of the finality of that action.

■ The May 20, 1986 letter revoked the PSD delegation in order to permit the EPA to exercise control over further proceedings concerning the permit which were intended to occur after a notice of proposed permit revocation had been published in the Federal Register. To the extent that the letter revoked the delegation of the permit authority to MDNR for purposes of the GDRRA facility, it arguably constituted a final action. However, appellees have failed to indicate how the revocation of permit authority alone resulted in any injury to them. Appellees have pointed to no provision which would entitle them to have their permit status determined by MDNR rather than EPA. To the contrary, Congress expressly reserved to the EPA the authority to implement and enforce the PSD program notwithstanding the delegation of authority to a state in § 110(c)(3) of the Clean Air Act, 42 U.S.C. § 7410(c)(3). Even assuming that appellees had standing to object to the revocation of permit authority, the proper forum to contest this final agency action would be the court of appeals.

■ The letter also conveyed the intent of the EPA to commence proceedings to investigate the revocation of the permit. The May 20, 1986 letter informed MDNR that it had made a provisional determination that MDNR did not implement the PSD program with respect to the GDRRA facility, and that it intended to propose that the permit be revoked. This action did not have the effect of revoking the permit or even of instituting proceedings necessary to revoke the permit. This portion of the letter did not constitute final agency action.

■ The district court apparently found that the issuance of the permit on November 9, 1984, coupled with the threat to that permit flowing from the May 20, 1986 letter was sufficient to satisfy the requirements of final agency action. While we disagree with this reasoning, even assuming it was correct, we would then be compelled to find that exclusive jurisdiction to review such purported final agency action lies in this court, not in the district court.

■ The district court relied on jurisdictional provisions of the Clean Air Act in § 304(e) of the Act, 42 U.S.C. § 7604(e), which provide in relevant part:

Nothing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any emission standard or limitation or to seek any other relief (including relief against the Administrator or a State agency).[1]

She then found subject matter jurisdiction under 28 U.S.C. § 1337, which provides original jurisdiction in the district courts for actions arising under acts of Congress regulating commerce, reasoning that the Clean Air Act was such an act.

■ Where a statute vests jurisdiction in a particular court, such exclusive jurisdiction precludes the exercise of original jurisdiction in other courts in all cases covered by that statute. *Telecommunications Research & Action Center*, 750 F.2d at 77. Thus, district court jurisdiction under 28 U.S.C. § 1337 may be precluded by a statutory scheme of review. *Donovan*, 713 F.2d at 1245. It has been held that district courts possess no jurisdiction in Clean Air Act cases through the Declaratory Judgment Act, the Mandamus Act or the federal question jurisdiction provisions of 28 U.S.C. § 1331, since Congress has provided for exclusive review by the appellate courts. *Telecommunications Research & Action Center*, 750 F.2d at 77; *Costle*, 647 F.2d at 677. The reasoning which precludes the

---

1. This subsection is contained in the provisions governing citizen suits found in § 304 of the Clean Air Act, 42 U.S.C. § 7604. Under § 304(a)(2) of the Act, 42 U.S.C. § 7604(a)(2), the district courts have jurisdiction to entertain suits against the Administrator which allege the failure on the part of the Administrator to perform a nondiscretionary act or duty. In the present case, it was not alleged that the Administrator failed to perform a nondiscretionary act, and neither appellees nor the district court relied on § 304(a)(2) as a basis of jurisdiction.

exercise of jurisdiction under the above provisions applies to the exercise of jurisdiction under § 1337. *See Natural Resources Defense Counsel, Inc. v. Thomas,* 689 F.Supp. 246 (S.D.N.Y.1988), *aff'd,* 885 F.2d 1067 (2d Cir.1989). Thus, the district court's conclusion that jurisdiction could be exercised under § 1337 was in error.

■ Appellees argue, however, that this case comes within an exception to the general rule that exclusive jurisdiction lies in the court of appeals. Although the district court did not rest its finding of jurisdiction on such an exception, we will, nevertheless, examine the merits of this argument. Appellees' argument is based on *Leedom v. Kyne,* 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958), in which the Supreme Court held that a litigant may bypass available administrative procedures where there is a readily observable usurpation of power not granted to the agency by Congress. As this court noted in *Donovan,* 713 F.2d at 1246:

> Nearly all the cases which address the question of district court jurisdiction for nonstatutory review of administrative action recognize that in narrow circumstances some residuum of federal question subject matter jurisdiction may exist in the United States District Court, although apparently otherwise precluded by a comprehensive statutory review scheme.

The *Leedom* exception is narrow, and is invoked only in exceptional circumstances. *Id.* As this court said in *Shawnee Coal Co. v. Andrus,* 661 F.2d 1083, 1093 (6th Cir.1981):

> The *Leedom* jurisdiction exception to the exhaustion doctrine is not automatically invoked whenever a challenge to the scope of an agency's authority is raised. On the contrary, it is a narrow anomaly reserved for extreme situations.

In order to bring a case within the exception, it must be shown that the action of the agency was a patent violation of its authority or that there has been a manifest infringement of substantial rights irremediable by the statutorily prescribed method of review. *See Leedom,* 358 U.S. at 188–

90, 79 S.Ct. at 183–84; *Donovan,* 713 F.2d at 1247; *Telecommunications Research and Action Center,* 750 F.2d at 78.

This limited exception to the exclusive jurisdiction of the courts of appeals is not invoked by the facts of this case. In a very similar situation, the Third Circuit recently refused to apply the *Leedom* exception in an action challenging the action of the EPA in issuing a cease and desist order based on a finding that a gas turbine cogeneration facility did not adequately reflect the best available control technology even though the State of Pennsylvania had issued a PSD permit for the facility. *See Solar Turbines Inc. v. Seif,* 879 F.2d 1073 (3rd Cir.1989). Solar Turbines argued in that case that the action of the EPA was *ultra vires* since it had previously approved Pennsylvania's state implementation plan. Appellees advance a similar argument here.

The actions of the EPA in this case cannot be characterized as a patent violation of its authority. Indeed the EPA was able to justify its action by reference to applicable provisions of the Clean Air Act, the Code of Federal Regulations and the language of the document by which it delegated PSD authority to the MDNR. The agreement delegating PSD permitting authority to the MDNR contained the following provision:

> If the EPA Regional Administrator determines that the State is not implementing or enforcing the PSD program in accordance with the terms and conditions of this delegation, the requirements of 40 CFR Section 52.21, or the Clean Act, this delegation ... may be revoked in whole or in part.

The district court found that the EPA lacked inherent authority to revoke its delegation of PSD authority because "Congress also specifically regulated when and how the EPA could revoke a state's delegated authority if it found the state was not properly implementing its authority." October 21, 1986 Memorandum Opinion and Order, page 17. But we have been unable to find any law which would impose constraints on the EPA's revocation of its delegation of PSD authority to a state. By

statute the PSD permit remains an EPA-issued permit. Under § 110(c)(3) of the Clean Air Act, Congress expressly reserved to EPA the authority to implement and to enforce the PSD program despite the delegation of authority to a state. The delegation of PSD authority to the State of Michigan contains an express reservation of the right to revoke PSD authority. We conclude, therefore, that this is not one of those exceptional cases involving a readily observable usurpation of power not granted to the agency by Congress, a patent violation of agency authority or a manifest infringement of substantial rights irremediable by the statutorily prescribed method of review.

In conclusion, we find that the district court did not have subject matter jurisdiction and was without authority to award attorney's fees to appellees under the Equal Access to Justice Act. The judgment of the district court granting the application of the Greater Detroit Resource Recovery Authority and Combustion Engineering for attorney's fees and costs is reversed.

MERRITT, Chief Judge, concurring.

I concur completely in the Court's opinion, but I would make one further point concerning exhaustion of administrative remedies. If the EPA action revoking its delegation of permit authority for the facility was "final agency action" within the meaning of § 307(b)(1) of the Clean Air Act, then jurisdiction was exclusively in the Court of Appeals. If the action of the EPA was in fact "nonfinal," then the plaintiffs would be obligated under standard administrative law doctrine to exhaust their administrative remedies before bringing suit. *See, e.g., Crocker v. Tennessee Secondary School Athletic Ass'n,* 873 F.2d 933, 935–36 (6th Cir.1989) (exhaustion requirement allows administrative agency to apply its expertise, develop facts, promote efficiency, and protect authority of administrative process). Both the Administrative Procedure Act and the Clean Air Act require exhaustion of administrative remedies prior to federal court review. *See Whitney Nat'l Bank v. Bank of New Orleans,* 379

U.S. 411, 422, 85 S.Ct. 551, 558, 13 L.Ed.2d 386 (1965) (where Congress "has enacted a specific statutory scheme for obtaining review, ... the doctrine of exhaustion of administrative remedies ... requires that the statutory mode of review be adhered to."); *Natural Resources Defense Council, Inc. v. United States Environmental Protection Agency,* 824 F.2d 1146, 1150 (D.C.Cir.1987) (stating that § 307(d) of Clean Air Act is statutory exhaustion requirement). Though in select circumstances "nonfinal" action would be properly heard in the District Court, *see Leedom v. Kyne,* 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958), this, as we have said above, is not such a situation.

Thus under either theory the District Court was without authority to decide the case on the merits. Either the EPA action was "final," and therefore jurisdiction was in the Court of Appeals, or the EPA action was "nonfinal," and therefore the doctrine of exhaustion would require that further steps be taken to exhaust EPA remedies before review is taken.

KRUPANSKY, Circuit Judge, dissenting.

By a stroke of legal legerdemain, the panel majority has divested the district court of its jurisdiction over an original action for declaratory and injunctive relief by conjuring the illusion that an equivocal, advisory letter from the Environmental Protection Agency constituted a final agency order reviewable only in this court pursuant to section 307(b)(1) of the Clean Air Act, 42 U.S.C. § 7607(b)(1) (section 307(b)(1)). Accordingly, I respectfully dissent.

The majority's opinion correctly notes that judicial review of all final actions of the Administrator of the Environmental Protection Agency (EPA) are cognizable in the first instance in the federal courts of appeals. Fatal to the validity of its disposition in this case, however, is its mischaracterization of the EPA's May 20, 1986 letter to the Michigan Department of Natural

Resources (MDNR) as final agency action within the meaning of section 307(b)(1).

By its terms, the May 20, 1986 letter from EPA regional administrator Adamkus to the MDNR stated that only a "provisional determination" had been made "that the State did not implement the PSD program with respect to the application and permit (Michigan Department of Natural Resources Permit # 468–83) for the City of Detroit Resource Recovery Facility (RRF)" and that the resource recovery facility's permit had been issued in contravention of the PSD delegation agreement. The letter further noticed that a "final determination" to revoke or uphold the permit (as distinct from EPA *delegation* to MDNR of authority to issue PSD permits) would *not be forthcoming until a period of public comment had expired.* The majority, having acknowledged this concise and unambiguous language, circumvents its implications in arriving at its factually unsupported conclusion that the letter represented "final agency action" against the RRF's duly issued construction permit, judicial review of which would lie, in the first instance, exclusively with this court.

Resolution of the jurisdictional issues joined in this appeal hinges on an interpretation of the EPA letter of May 20, 1986. The interpretation of the letter, in turn, rests on analyzing the subtleties of its composition.

It is noteworthy that the terms "revocation of PSD delegation" to the State of Michigan and "the revocation of the RRA permit" are not synonymous. The syntax of the letter addresses two separate and distinct mutually independent actions, *neither* of which were "final" within the meaning of section 307(b)(1).[1] As the panel majority recognizes, the May 20 letter informed appellees that "the PSD *delegation* is revoked with respect to the Detroit RRF

until further notice," thus allowing the EPA to exercise *future* control over the duly issued construction permit held by the GDRRA, which *future control was not intended to be exercised, if at all, until the unspecified time at which a notice of the proposed revocation of RRF permit # 468–65 had been published in the Federal Register.*

The thrust of a second course of threatened action announced in the letter was the conduct of future EPA proceedings, as reflected in EPA's "provisional determination" that it *"intends* to *propose* that this permit be revoked."* This course of action was, by its terms, non-final: "This provisional determination does not prejudice the U.S. EPA with respect to the final determination which will be made after public comments have been considered on the proposal to revoke the permit," a permit that had already been issued to the GDRRA, symbolizing EPA's approval of the project as designed, which approval was the RRF's *sine qua non,* and which induced GDRRA to issue and market bonds to fund the project, execute construction contracts, undertake actual construction and otherwise materially alter its position.

The record and arguments reflect that the May 20, 1986 "provisional determination" had an explosive effect on the project. The letter immediately halted construction of the RRF, a half billion dollar project; undermined the economic viability of the funded financing of the development by raising the spectre of additional, significant costs on the project, including, but not limited to, the cost of redesigning the facility to accommodate the installation of acid scrubbers, which were intentionally excluded from the RRF's original designs and specifications without EPA objection; virtually eliminated the primary and secondary markets for the half billion dollars of

---

**1.** The panel majority appears to conclude that the letter announced a decision that was final, in part, and non-final, in part. With respect to the revocation of the MDNR's delegated PSD authority, the majority finds that this was "arguably ... final action." With respect to revocation of the RRF's permit, the majority notes that

[t]he letter ... conveyed the intent of the EPA to commence proceedings to investigate the revocation of the permit.... This action did not have the effect of revoking the permit or even of instituting proceedings necessary to revoke the permit. This portion of the letter *did not* constitute final agency action. (emphasis added).

bonds issued to finance the construction; and occasioned an unscheduled and unforeseen regulatory delay that imposed upon the Greater Detroit Resource Recovery Authority (GDRRA) an eruption of unfunded interest obligations in an amount approximating $10,800,000, already accrued over the ninety day period[2] during which EPA had refused to take any action to resolve the impasse occasioned by the letter.

These consequences, coupled with the EPA's continued refusal to withdraw its letter[3] or, in the alternative, to issue a final appealable order or, at the very least, to commence formal agency action to provide the necessary forum for the appellants to exhaust their administrative challenges preliminary to perfecting a petition for judicial review in an appropriate circuit court pursuant to section 307(b)(1), left the appellants without any available and adequate remedy at law to purge the project of the cascading irreparable injury precipitated by the threatening letter of May 20, 1986, and forced appellants to resort to original actions for declaratory and injunctive relief.

After three months of futility in pursuing a final agency order to resolve the impasse, appellants commenced an original action in the United States District Court for the Eastern District of Michigan for declaratory and injunctive relief demanded by the public interest in salvaging the project from the irreparable injury resulting from the EPA's calculated nonfeasance.

The EPA conceded before the district court that it had no evidence of fraud or misrepresentation either by the MDNR in issuing Resource Permit # 468–85 or by the GDRRA in applying for and initially acquiring the permit, or of any subsequent breach of the permit's conditions. The EPA further admitted that it had no express statutory authority to revoke the permit, but argued that its authority could be *inferred* from the absence of an express statutory prohibition against such action. The trial court refused to indulge the EPA's argument for implied "inherent" authority, and granted appellees' motion for summary judgment and dismissed the EPA's cross motion for similar relief. The trial judge, in a narrowly crafted opinion, noted that:

Congress provided a complex review procedure before a permit is granted. Congress also specifically regulated when and how the EPA could revoke a state's delegated authority if it found that the state was not properly implementing its authority. Congress also provided means whereby the EPA could revoke or suspend a permit it had issued if a permittee violated any term or condition of the permit, or if a permittee misrepresented, inaccurately described, or failed to disclose any material fact in the permit application. 40 C.F.R. 22.13. However, revocation under this section is not permitted until a trial on the issues is concluded.

\*  \*  \*  \*  \*  \*

IT IS ORDERED that plaintiffs' motion for summary judgment be granted and that defendants' motion to dismiss or, in the alternative, for summary judgment, be denied.

IT IS FURTHER ORDERED that defendants are enjoined from any action or attempt to revoke this permit on the basis solely of any evidence now discovered and facts known as of this date. This order does not preclude the EPA, based

---

2. Calculated at a conservative interest rate of 8.5% on a half billion dollar obligation.

3. It is correct, as the majority relates, that virtually on the eve of trial—more than two months after the appellants commenced their action in the district court seeking injunctive relief from the disastrous effects of the May 20, 1986 letter, which avalanched as a result of the EPA's adamant refusal to rescind the letter during the intervening four months—and not until appellants' probability of success in pursuing injunc-

tive relief became apparent from damaging evidence produced under subpoena concerning the lack of a factual basis for challenging the validity of the permit, that the EPA withdrew its letter (in what appellees characterize as an attempt to moot the controversy), but rejected a proposed consent decree under which it would be foreclosed from initiating repetitious action calculated to evade review. The district court removed that contingency in its narrowly tailored disposition.

on additional evidence previously not available, new information, and/or new legislation, from doing what is appropriate or required at that time.

The trial court's tailored disposition immediately removed the cloud upon the construction and financing of the RRF and permitted development of the facility to go forward unhampered by costly delays, without impeding the EPA from properly initiating and timely pursuing future proceedings against either the MDNR to revoke its delegated PSD authority or against the GDRRA directly to revoke permit # 468–85 for causes within the parameters prescribed by existing congressional enabling legislation and associated regulations.

The EPA elected not to pursue an appeal and abandoned all efforts to proceed either against MDNR and its delegated PSD authority or against permit # 468–83.

This brief historical resume of the proceeding below affords a necessary backdrop for a disposition of the threshold jurisdictional issue confronting this appellate review and exposes the achilles heel of the panel majority's reasoning in support of its resolutions. To conclude, as the panel majority does, after recognizing the distinction between revoking delegation of PSD authority to the State of Michigan MDNR and revoking permit # 468–83 issued to the GDRRA, that the letter "arguably constituted a final action," is an unrealistic and obfuscatory interpretation of the document. The conflict in the panel majority's reasoning is reflected in its opinion wherein it concedes that the letter, as it concerned the permit (as opposed to the permit delegation), did not constitute a final appealable order. *See supra* note 1.

When read in context, the letter (which was addressed only to the MDNR without a copy to the GDRRA) may have been arguably interpreted as notice to the State of Michigan MDNR of immediate revocation of future EPA delegated PSD authority. However, it would require convolution of any logical interpretation of the letter to characterize it as a final order directed to the GDRRA noticing it of an immediate revocation of its duly approved and issued construction permit, the conditions of which had admittedly not been breached. At best, as it applied to the RRF permit, the letter constituted a "provisional determination" that "USEPA ... intends to propose that this permit be revoked." Even as applied to the delegation of permit authority, the EPA's "decision" was non-final because the revocation was effective only "until further notice." Consequently, by its *terms* the letter announced an intended future course of action that was non-final.

In sum, it was the overt refusal of the EPA, in the first instance, to issue a final order concerning the RRF permit and, in the second instance, to provide an administrative forum in which to resolve the questions broached by the May 20 letter—which forum, in turn, would have provided the platform for direct appeal to a circuit court pursuant to section 307(b)(1) of the Clean Air Act—that supported the original jurisdiction of the district court to entertain this action for declaratory and injunctive relief.

Because the May 20, 1986 letter did not, under any reasonable interpretation, constitute "final agency action," district court jurisdiction over the original action for equitable relief was not barred by the otherwise exclusive jurisdictional scheme provided in section 307(b)(1), because that provision, by its terms, applies only to petitions for review from "final agency action[s] of the Administrator." [4]

---

**4.** Even if the letter could be read to constitute a final action of the EPA, the district court's jurisdiction would have been proper under the exception created in *Leedom v. Kyne*, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958), an exception that the majority opinion (insofar as it posits that the letter comprehended a final action) erroneously concludes would not apply to the case at bar. Although the *Leedom* exception has always been construed as a narrow one, the facts of this case nevertheless fully justify its application. As in *Leedom, id.* at 190, 79 S.Ct. at 184, to deprive appellees in this case of recourse to the original jurisdiction of the district court "would mean 'a sacrifice or obliteration of a right which Congress'" had conferred upon them in the Administrative Procedures Act. *See* 5 U.S.C. § 555(b) (agencies required to conduct business and resolve matters before them "within a reasonable time"). Moreover, as in *Lee-*

**328**

The majority and concurring opinions question the district court's jurisdiction by suggesting that the appellees were in error for failing to exhaust their administrative remedies. The doctrine of exhaustion is of no relevance in this case, where the EPA refused to issue a final order, thereby denying appellants an adequate remedy at law by depriving them of a forum in which to arrive at a "final order," the existence of which was a prerequisite to judicial review under section 307(b)(1). *See GDRRA v. EPA,* 677 F.Supp. 521, 526 (E.D.Mich.1987) (after issuing the May 20, 1986 letter, the EPA "did nothing" to resolve the dispute about the permit's validity).

The doctrine of exhaustion of administrative remedies is intended to preclude judicial consideration of cases in which "the process of administrative decision-making is still at a stage where the intervention of judicial review will 'disrupt the orderly process of adjudication.'" *Nat'l Automatic Laundry and Cleaning Council v. Shultz,* 443 F.2d 689, 700–01 (D.C.Cir.1971) (quoting *Port of Boston Marine Terminal Assoc. v. Rederiaktiebolaget Transatlantic,* 400 U.S. 62, 71, 91 S.Ct. 203, 209, 27 L.Ed.2d 203 (1970)).

> Exhaustion is generally required as a matter of preventing premature interference with agency processes, so that the agency may function efficiently and so that it may have an opportunity to correct its own errors, to afford the parties and the courts the benefit of its experience and expertise, and to compile a record which is adequate for judicial review.

*Weinberger v. Salfi,* 422 U.S. 749, 765, 95 S.Ct. 2457, 2467, 45 L.Ed.2d 522 (1975).

Because the EPA intentionally refused to institute an "orderly process of adjudication" with respect to GDRRA's facility, the doctrine of exhaustion has no bearing upon this case.

Moreover, the EPA letter of May 20, 1986 and its immediate volatile effects, coupled with EPA's premeditated resolve not to implement orderly administrative procedures so as to afford appellees access to available adequate remedies at law, made this agency-induced controversy ripe for adjudication in the district court.[5] Under the pronouncements of the Supreme Court in *Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), an administrative matter is "ripe" for adjudication in federal court if: 1) the issues joined are susceptible to judicial determination; and 2) the party seeking review would be subject to hardship in the absence of judicial intervention. *Id.* at 153, 87 S.Ct. at 1517. Both of the *Abbott Laboratories* criteria are fully satisfied in the case at bar because: 1) it was not beyond the competence of the district court to determine whether the EPA was statutorily justified in failing to take further action subsequent to issuance of the May 20, 1986 letter;[6] and 2) in the absence of relief from the district court there was simply no legal recourse available to the appellees to protect the project and the public interest from suffering substantial financial and logistical injury in light of the EPA's refusal to take action necessary to finalize its order.

In sum, in this case appellees were confronted with a quandary provoked by an EPA threat that devastated expectations in the construction and completion of a massive public works facility. The EPA "did

---

dom, the otherwise exclusive "review" provision of section 307(b)(1) presented no obstacle to district court jurisdiction because "this suit [was] not one to 'review,' in the sense that term as it is used in the [Clean Air] Act, a decision of the [EPA] made within its jurisdiction." *Leedom,* 358 U.S. at 188, 79 S.Ct. at 184.

**5.** The principle of exhaustion is closely correlated with the principle of "ripeness" in the administrative context. *See Nat'l Automatic Laundry and Cleaning Council v. Shultz,* 443 F.2d 689, 692 (D.C.Cir.1971) (prerequisites to judicial re-

view of administrative actions—such as standing, ripeness and exhaustion—"are separable ... but ... are intermeshed in the overall determination of the appropriate occasion for judicial review").

**6.** *See New York State Ophthalmological Soc. v. Bowen,* 854 F.2d 1379, 1386 (D.C.Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 2448, 104 L.Ed.2d 1003 (1989) ("A controversy is ripe if further administrative process will not aid in the development of facts needed by the court to decide the question it is asked to consider.").

nothing" to usher the situation into a posture of final resolution, but intentionally and irreparably injured the appellants and the public interests they served by refusing to issue a final order resolving the questions raised in the May 20, 1986 letter, thereby depriving appellants of an adequate remedy at law.

Accordingly, I respectfully dissent from the majority disposition that the district court did not have jurisdiction over the underlying litigation, and would further conclude that the district court's finding of bad faith under the EAJA was not clearly erroneous, and that the award of attorneys' fees therefore must be affirmed. *See Bergman v. United States*, 844 F.2d 353, 357 (6th Cir.1988) (award of fees under bad faith exception to American Rule reversible only if finding of bad faith is clearly erroneous).