CUYAHOGA VALLEY RAILWAY COM-PANY; The Mahoning Valley Railway Company; The River Terminal Railway Company, Plaintiffs–Appellees,

Norfolk and Western Railway Company; CSX Transportation; Cincinnati, New Orleans & Texas Pacific Railroad Company; Consolidated Rail Corporation; Grand Trunk Western Railroad Company; Wheeling & Lake Erie Railway Company, Intervenors–Appellees,

v.

Roger W. TRACY, Ohio Tax Commissioner, Defendant–Appellant (92–3557), Defendant (92–3558),

Mary E. Withrow, Ohio Treasurer, Defendant (92–3557), Defendant–Appellant (92–3558).

Nos. 92–3557, 92–3558.

United States Court of Appeals, Sixth Circuit.

Argued June 11, 1993.

Decided Sept. 28, 1993.

Rehearing and Suggestion for Rehearing En Banc Denied in No. 92–3557 Nov. 30, 1993.

David W. Alexander (briefed), Philomena M. Dane (argued), Squire, Sanders & Dempsey, Columbus, OH, for plaintiffs-appellees.

Kathleen M. Trafford (argued and briefed), Patrick Jerome Smith, Porter, Wright, Morris & Arthur, Columbus, OH, Everett Gibson, Memphis, TN, Aaron P. Rosenfeld (briefed), Raymond D. Anderson, Eric A. Pierce, Vorys, Sater, Seymour & Pease, Columbus, OH, for intervenors-appellees.

James C. Sauer, Asst. Atty. Gen. (argued and briefed), Office of the Atty. Gen. of Ohio, Columbus, OH, for defendant-appellant.

Andrew S. Bergman (argued), Office of the Atty. Gen. of Ohio, Columbus, OH, for defendant.

Before: KEITH and RYAN, Circuit Judges; and WELLFORD, Senior Circuit Judge.

RYAN, Circuit Judge.

The defendants, Ohio Tax Commissioner Roger W. Tracy and Ohio Treasurer Mary E. Withrow, appeal following the district court's April 24, 1992, order allowing two different groups of interstate railroads to intervene as plaintiffs,[1] and modifying its already-issued summary judgment of August 29, 1991. This summary judgment disposed of claims originally brought by three intrastate Ohio railway companies, seeking declaratory and injunctive relief to protect them from an allegedly discriminatory excise tax levied by the state of Ohio against railroads.

In this appeal, the defendants first seek to raise arguments relating to the substance of the original August summary judgment. We do not reach the claims of the defendants insofar as they relate to the merits of the first order, however, because their delay in filing an appeal amounted to a waiver of those issues; as a result, this court has no jurisdiction to review the defendants' claims in this regard.

---

1. The Interstate Commerce Commission classifies railroads according to the amount of operating revenues. 49 C.F.R. § 1201(A)(1–1). The revenue classification level for Class I railroads is $250 million; for Class II railroads, less than $250 million but more than $20 million; and for Class III railroads, $20 million or less. 57 Fed. Reg. 27184 (June 18, 1992). The plaintiffs are Class III railroads. One group of would-be intervenors consists of Class I railroads, while the other would-be intervenor is a Class II railroad.

The defendants also contend that the district court abused its discretion in granting the motions to intervene after the summary judgment had become final. In the alternative to this argument, they raise arguments regarding the substance of the April order, insofar as it modified the August summary judgment. Because we conclude that the district court abused its discretion in permitting the two groups of interstate railroads to intervene, we will not consider the merits of the district court's legal conclusions in its order modifying the summary judgment.

In short, for the reasons discussed below, we reverse the April 1992 order of the district court, but do not disturb the order of August 1991.

## I.

In May 1988, three intrastate Ohio railway companies—the Cuyahoga Valley Railway Company, The Mahoning Valley Railway Company, and The River Terminal Railway Company—brought suit against the Tax Commissioner and the Treasurer of Ohio, under 49 U.S.C. § 11503(c), commonly referred to as Section 306 of the Railroad Revitalization and Regulatory Reform Act of 1976 (the "4–R Act").[2] The plaintiffs contended that an excise tax levied by Ohio against railroads discriminated in violation of this statute, and they sought declaratory and injunctive relief.

The plaintiffs are each a "railroad company" as defined by Ohio statutes. OHIO REV. CODE ANN. § 5727.01(D)(9) (Baldwin).[3] They were therefore subject to the railroad excise tax that is the subject of this suit. That tax was levied "for the privilege of owning property in this state or doing business in this

state during the twelve-month period next succeeding the period upon which the tax is based," and was "imposed against each such public utility which, on the first day of such twelve-month period, owns property in [Ohio] or is doing business in [Ohio.]" OHIO REV. CODE ANN. § 5727.30 (Baldwin).[4] The statute imposing the excise tax was amended, however, effective December 22, 1992. Am. Sub.House Bill 904, 1992 Ohio Legis.Bull. 728 (Anderson). The statute is now titled the "Annual excise tax for owning property or doing business as public utility in this state," and explicitly excludes railroad companies from its scope. The amendment excluding railroads applies prospectively only, but nonetheless, as the Class I intervenors asserted in a letter filed pursuant to Fed. R.App.P. 28(j), "[t]he prospective repeal of the Ohio railroad excise tax limits the significance of the district court's order to tax years prior to the 1993 tax year."

The statute originally, however, imposed an excise tax on the gross earnings of railroad companies, but excluded earnings that were derived wholly from interstate business. OHIO REV.CODE ANN. § 5727.34 (Baldwin) (repealed 1992). This exclusion meant that the tax placed a far heavier burden on wholly intrastate railroads, such as the plaintiffs, than it did on interstate carriers. The tax was assessed annually, but the companies were required to make three advance payments over the course of the year: on October 15, March 1, and June 1. Prior to the filing of their complaint, the plaintiffs paid directly to the state Treasurer the first and second advance payments for fiscal year 1988, which were due on October 15, 1987, and March 1, 1988. They paid the third advance payment, and all following pay-

---

**2.** That provision was an amendment to the Interstate Commerce Act, 49 U.S.C. §§ 1 et seq., and was originally codified at 49 U.S.C. § 26c. In the recodification accomplished by the Revised Interstate Commerce Act of 1978, Pub.L. 95–473, 92 Stat. 1337, 1445, the section was moved to its present location at 49 U.S.C. § 11503.

**3.** "Any person ... [i]s a railroad company when engaged in the business of owning or operating a railroad either wholly or partially within this state on rights of way acquired and held exclusively by such company, or otherwise, and includes a passenger, street, suburban, or interur-

ban railroad company." OHIO REV CODE ANN. § 5727.01(D)(9) (Baldwin).

**4.** The original version of the statute imposing this tax was effective July 6, 1984. Sub. House Bill 794, 1984 Ohio Legis.Serv. 5–567 (Baldwin). The statute was amended, effective December 31, 1989, to exclude "freight line and equipment companies" from its scope. Am.Sub.Senate Bill 156, 1989 Ohio Legis.Serv. 5–526 (Baldwin). As discussed in the text accompanying this footnote, the statute has again been amended since the inception of this lawsuit.

ments, into the district court's registry, pursuant to an agreed order. The funds were eventually moved into an account at Banc-Ohio National Bank.

On August 29, 1991, the district court entered an order granting summary judgment in favor of the plaintiffs, holding that the railroad excise tax violated Section 306 of the 4–R Act. It eschewed a result-oriented analysis which had been suggested by the defendants, holding instead that it was not necessary to find an actual discriminatory effect in order to find a discriminatory violation. In so holding, the court specifically opined that "it should not be within this Courts [sic] discretion to analyze the disputed tax in the context of Ohio's overall tax structure." Because the excise tax, the court reasoned, applied to a single class of business—namely, railroads—the tax therefore necessarily discriminated against that class of business. The court noted that "the defendants [sic] sole reliance on the fact that some of the railroad companies in Ohio are relieved of this tax burden [5] does not solve the proscription against discriminatory taxes upon railroads which has always been the sole and underlying intent of the 4–R Act." (Footnote added.) It ordered, accordingly, that "[t]he defendant State of Ohio is ... enjoined from levying, assessing or collecting any taxes pursuant to [the railroad excise tax statute]." The court further ordered the Treasurer to return the two advance payments for the fiscal year beginning July 1, 1988, together with interest, that the plaintiffs had paid directly to the Treasurer rather than into escrow, and ordered the release of all escrowed tax payments plus interest. The court provided that if the order were appealed, the judgment would be stayed and the plaintiffs would have to continue making advance payments into the escrow account.

The state of Ohio did not appeal, however, and it released the escrowed tax payments to the plaintiffs; but it has not refunded the advance payments that were made to the Treasurer, nor has it paid the prejudgment interest ordered by the court. Ohio did, however, stop collecting the railroad excise tax. As discussed above, Ohio amended its excise tax statute to exclude railroads, effective December 22, 1992. Even prior to that change, though, commencing with the 1992 fiscal year, Ohio began subjecting all railway companies to Ohio's corporation franchise tax rather than to the excise tax. OHIO REV. CODE ANN. § 5733.01 (Baldwin). This tax payment is calculated based on the value of each corporation's issued and outstanding shares of stock. Ohio announced on October 2, 1991, that all railroads would be subject to the franchise tax, and the Tax Commissioner sent out the necessary franchise tax forms in January 1992. Ohio instituted this administrative change in its tax collection procedures one year prior to making the same change legislatively, because it believed that the district court's order invalidating the railroad excise tax made a legislative change unnecessary. This change in Ohio's tax treatment of railroads meant that although the wholly intrastate carriers received some tax relief as a result of the district court's August order, all interstate rail carriers had to pay higher taxes, because their interstate gross earnings were no longer exempted from taxation.

In January 1992, more than four months after summary judgment was entered for the plaintiffs, the five interstate railroad companies operating in Ohio, referred to as the Class I intervenors, filed a motion to intervene. They asserted that although they were aware of the lawsuit as early as June 1988, they had opted not to intervene then because they believed their interest was adequately represented by the Attorney General of Ohio. They claimed that it was not until October 1991, when they became aware of the Tax Commissioner's decision to forego collecting the excise tax as to all railroads and to instead implement the corporation franchise tax—to, as they put it, "broadly and erroneously" interpret the district court's August judgment—that they realized they had an interest in the suit. They filed a motion to modify the district court's August judgment in order to limit the declaration that the excise tax violated Section 306, so that the court's judgment would be applied

---

**5.** The court here was referring to interstate railroads. As we have already noted, income from interstate earnings was exempt from the railroad excise tax.

only to the plaintiffs in this case. Essentially, the would-be intervenors sought to have the district court prevent Ohio from administratively changing its tax policy vis-à-vis them.

In February 1992, another railroad, Wheeling & Lake Erie Railway, also filed a motion to intervene. Wheeling is an interstate Class II railroad, and wanted to intervene in order to oppose the Class I intervenors' proposed modification of the August 1991 order. It benefitted from Ohio's across-the-board application of the court's finding that the tax violated federal statutes, and the resulting change in tax treatment. It therefore wished to resist the Class I intervenors' proposed attempt to limit the scope of the August order.

The state of Ohio also opposed the Class I intervenors' motion. It argued that it had already relied on the August order by releasing the escrowed payments, and by foregoing the collection of the excise tax as scheduled for October. Furthermore, it had foregone the opportunity to appeal to the state legislature for a change in the tax law for the then-current tax year, and would be unable to achieve the desired legislation until the 1993 tax year.

The district court granted both motions to intervene in its April 1992 order. It reasoned that the Class I railroads' motion was timely because they

> sought legal counsel and reasonably concluded that they would not have been granted leave to intervene in the suit between the plaintiffs and the State of Ohio. Further, they had no reason to believe that the Court would adjudicate their rights in a lawsuit to which they were not parties. It was only after the Ohio Tax Commissioner told them that the State of Ohio was going to collect the franchise tax rather than the railroad excise tax from them that they had cause to seek clarification of the Court's August 29, 1991 Opinion and Order.

Although also granting the Class II intervenor's motion to intervene, the court did not provide an explicit rationale for doing so.

The court then limited its August 1991 summary judgment order by adding the language "as applied to these plaintiffs" following the declaration that the excise tax was discriminatory, and stated that it had neglected through "clerical mistake" to originally include this language. The court, despite this added language, included the Class II intervenor within the scope of its holding of discrimination, and declared that the excise tax would violate the 4–R Act if applied to that railroad. Thus, the effect of the April 1992 order was to prohibit Ohio from substituting the corporation franchise tax for the excise tax in relation to the Class I intervenors, while simultaneously prohibiting the opposite action with regard to the Class II intervenors. The court failed to explain its basis for the apparently contradictory treatment of the two categories of intervenors. The April order made no other modifications to the August order.

The defendants filed a timely appeal from the April order.

## II.

Congress's purpose in passing the 4–R Act was "to provide the means to rehabilitate and maintain the physical facilities, improve the operations and structure, and restore the financial stability of the railway system of the United States." 45 U.S.C. § 801(a). One impediment to such financial stability was discriminatory taxation. *See Union Carbide Corp. v. State Bd. of Tax Comm'rs,* 992 F.2d 119, 121 (7th Cir.1993) (quoting H.R.Rep. No. 725, 94th Cong., 1st Sess. 78 (1975)). Congress concluded that "[i]n view of the generally poor economic condition of the railroad industry and the effect such economic hardship is having on the ability of the industry to adequately serve our national rail transportation needs, ... discriminatory property and 'in lieu' taxation should be ended." *Id.*

To relieve that burden, Congress prohibited discriminatory state and local taxation, providing in relevant part as follows:

> (b) The following acts unreasonably burden and discriminate against interstate commerce, and a State, subdivision of a State, or authority acting for a State or

subdivision of a State may not do any of them:

(1) assess rail transportation property at a value that has a higher ratio to the true market value of the rail transportation property than the ratio that the assessed value of other commercial and industrial property in the same assessment jurisdiction has to the true market value of the other commercial and industrial property.

(2) levy or collect a tax on an assessment that may not be made under clause (1) of this subsection.

(3) levy or collect an ad valorem property tax on rail transportation property at a tax rate that exceeds the tax rate applicable to commercial and industrial property in the same assessment jurisdiction.

(4) impose another tax that discriminates against a rail carrier providing transportation subject to the jurisdiction of the Commission under subchapter I of chapter 105 of this title.

49 U.S.C. § 11503(b). Section 11503(c) grants federal district courts jurisdiction to prevent violations of section 11503(b).

### A.

Ohio first argues that the district court erred in ordering the state to repay the advance payments of excise tax, and further, in ordering it to pay prejudgment interest to the plaintiffs on those advance payments. It contends that, pursuant to the Eleventh Amendment, the state cannot be made subject to "retroactive relief," which is Ohio's characterization of the repayment order. Ohio further argues that the doctrine of sovereign immunity exempts the state from paying prejudgment interest to the plaintiffs.

Ohio contends that it has not waived the right to appeal this issue, even though (1) the court made its order regarding the advance payments in August 1991 and (2) the state has filed a timely appeal only from the April 1992 order, which made no mention of the interest payments. Its argument, essentially, is that since the April order modified certain aspects of the August order, every item in the August order is now properly subject to appeal.

■■■ Compliance with the thirty-day time limit for filing an appeal set forth in Fed.R.App.P. 4(a)(1) is mandatory and jurisdictional. *Peake v. First Nat'l Bank & Trust Co.*, 717 F.2d 1016, 1018 (6th Cir.1983). We exercise *de novo* review of questions of subject matter jurisdiction. *Greater Detroit Resource Recovery Auth. v. United States Envtl. Protection Agency*, 916 F.2d 317, 319 (6th Cir.1990).

In support of its argument, Ohio quotes *Federal Trade Commission v. Minneapolis–Honeywell Regulator Co.*, 344 U.S. 206, 73 S.Ct. 245, 97 L.Ed. 245 (1952), perhaps the definitive case relating to a district court's modification of orders, and the resulting effect on the time for appeal:

Only when the lower court changes matters of substance ... should the period within which an appeal must be taken ... begin to run anew. The test is a practical one. The question is whether the lower court, in its second order, has distributed or revised legal rights and obligations which, by its prior judgment, had been plainly and properly settled with finality.

*Id.* at 211–12, 73 S.Ct. at 249. (footnote omitted); *see also Whittington v. Milby*, 928 F.2d 188, 191 (6th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 236, 116 L.Ed.2d 192 (1991). Ohio suggests that this language means that in all cases in which a second order substantively changes a first order, the time for appeal should begin to run anew as to all aspects of that first order.

The state of Ohio may very well be correct that the April order presents a substantive modification to the August order, and also in its assertion that the period for appeal should be deemed to run anew. But its accuracy on this score, *vel non,* is immaterial, because the order to repay the advance payments plus prejudgment interest was not altered one whit by the second order; the state, revealingly, does not even contend that it was. The Tax Commissioner, in fact, concedes that "[t]his part of the order was preserved in the Opinion and Order of April 24, 1991 [sic]." The relevant case law in no way suggests that once one issue has been modified, all of

the issues from the original order are fair game for appeal. Instead, it is quite clear that by failing to appeal from the August order, the state waived its right to argue the issue of the interest payments, and accepted the August order as final. *See Peake,* 717 F.2d at 1020. The court's later modification of the August order, which was wholly independent of the issue the state is disputing, should not alter the state of repose.

■ Of course, there is an argument to be made—although Ohio has not actually made it—that jurisdictional issues cannot be waived, and that if the doctrine of sovereign immunity destroys the federal courts' power to award interest against Ohio, then it does not matter that Ohio originally failed to appeal the award. *Cf. Greater Detroit Resource Recovery Authority,* 916 F.2d at 319. In a contest between the two jurisdictional doctrines, however, we favor the doctrine that will not disturb the district court's ruling. The state had an obligation to timely object to that aspect of the district court's award of which it now complains. It is apparent that had the district court not otherwise modified the order, the state would have foregone its right to argue this point. The state has not made a single persuasive argument for how the change in circumstances to which it points in any way excuses, or even implicates, its failure to earlier raise this sovereign immunity argument.[6]

This court will, therefore, not now revisit the propriety of the district court's order to repay the advance payments together with prejudgment interest.

## B.

Ohio's second argument is that the motion of the Class I intervenors was untimely because, four months before the motion to intervene was filed, the action had proceeded to final judgment.[7] Ohio asserts that the

intervenors had no justification for their delay, because by their own admission, they knew of the suit as early as June 1988; although the intervenors claim that they thought the state of Ohio would adequately protect their interest, Ohio contends that this claim cannot be taken seriously. Moreover, Ohio argues, the granting of the intervenors' motion prejudiced its interests.

■ In a motion to intervene as of right pursuant to Fed.R.Civ.P. 24(a)(2), the district court's determination of the timeliness requirement is reviewable under an abuse of discretion standard, *Bradley v. Milliken,* 828 F.2d 1186, 1191 (6th Cir.1987), while the remaining Rule 24(a)(2) factors are reviewed *de novo. Grubbs v. Norris,* 870 F.2d 343, 345 (6th Cir.1989). Fed.R.Civ.P. 24(a)(2) reads, in relevant part, as follows:

> (a) **Intervention of Right.** Upon timely application anyone shall be permitted to intervene in an action: ... (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

■ In order to succeed on their motion to intervene by right, the two categories of railroads would need to demonstrate their compliance with each of four criteria: (1) that they have timely applied to intervene; (2) that they have a substantial legal interest in the pending litigation; (3) that their ability to protect that interest is impaired; and (4) that the parties presently before the court do not adequately represent that interest. *See Grubbs,* 870 F.2d at 345. The question of timeliness is considered with regard to five factors:

---

6. As the state of Ohio conceded at oral argument, moreover, it never raised this argument at any stage before the district court, further compounding the error of its failure to appeal. In general, this court will not consider arguments raised for the first time on appeal, *Federal Deposit Ins. Corp. v. Binion,* 953 F.2d 1013, 1018 (6th Cir.1991), although this general rule does not apply to questions of subject matter jurisdiction.

7. Although Ohio likewise argues that the Class II intervenor's motion was also untimely, it devotes far less attention to the Class II intervenor than it does to the Class I intervenors. The Class II intervenor attempted to intervene only in order to oppose the Class I intervenors.

(1) the point to which the suit has progressed; (2) the purpose for which intervention is sought; (3) the length of time preceding the application during which the proposed intervenor knew or reasonably should have known of his interest in the case; (4) the prejudice to the original parties due to the proposed intervenor's failure, after he or she knew or reasonably should have known of his or her interest in the case, to apply promptly for intervention; and (5) the existence of unusual circumstances militating against or in favor of intervention.

*Id.*

■ The interests of the Class I intervenors were implicated by this lawsuit from its inception, because there was plainly a chance that the excise tax would be deemed discriminatory. And it is likewise plain that Ohio's response to the court's August order—that is, the cessation of the collection of the excise tax—was a proper and reasonable interpretation of the order, and not a "broad[ ] and erroneous[ ]" reading, as the intervenors contend. Thus, it would not have required unusual prescience on the part of the intervenors to recognize that their interests were implicated, and therefore to intervene in the suit long before 1992. In fact, they appear to concede this recognition when they argue that they assumed, in 1988, that the Ohio Attorney General would "adequately protect their interests"—thus indicating that they felt they had some interests to protect. They were, moreover, correct in this assumption, because Ohio had a strong interest in maintaining its chosen tax scheme, and did its best to persuade the district court that this would be the proper outcome. The court nonetheless found the tax to be discriminatory, despite Ohio's best efforts.

The intervenors chose to rely on the Attorney General's best efforts, which they were entitled to do. They are not, however, entitled to then enter the proceedings after the case has been fully resolved, in an attempt to achieve a more satisfactory resolution.[8] A

strong factor in our conclusion is the recognition that any other result would greatly prejudice the state of Ohio. Ohio would not have released the plaintiffs' escrowed payments and discontinued collection of the railroad excise tax had it known there was a possibility that other railroads would intervene in the case. Further, because of the intervenors' delay in raising their claim, Ohio lost the opportunity to achieve, for 1992, a satisfactory resolution to its tax problems via a legislative route.

■ The Class II railroad's motion to intervene is also untimely, because the suit had already progressed to final judgment and because the railroad should have long been aware of the existence of the suit. More significantly, however, the fourth criterion for intervention as of right weighs against intervention: the existing parties to the suit adequately protected the Class II intervenor's interest.

### III.

The district court erred in granting the motions to intervene of both classes of intervenors, and its April 1992 order is therefore **REVERSED.**

---

8. We further note, although the parties have not argued this point, that the intervenors are not prejudiced by not being able to intervene in this suit. They are free to now bring suit themselves

under the 4–R Act, in order to claim that the new tax structure, applying the corporate franchise tax to them, is discriminatory.