### III.

For the reasons stated herein, we **REVERSE** the judgment of the district court and **REMAND** to the court with instructions that the jury verdict be **VACATED** and the injunction be dissolved.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2000 FED App. 0330P (6th Cir.)
File Name: 00a0330p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

JOSEPH M. POPOVICH,
        *Plaintiff-Appellee/*
        *Cross-Appellant,*

        *v.*

CUYAHOGA COUNTY COURT
OF COMMON PLEAS,
Domestic Relations Division,
        *Defendant-Appellant/*
        *Cross-Appellee,*

CUYAHOGA COUNTY,
        *Defendant-Appellee.*

Nos. 98-4100/4540

Appeal from the United States District Court
for the Northern District of Ohio at Akron.
No. 95-00684—James S. Gallas, Magistrate Judge.

Argued: April 26, 2000

Decided and Filed: September 18, 2000

Before: RYAN and BOGGS, Circuit Judges; DUGGAN, District Judge.*

_____

*The Honorable Patrick J. Duggan, United States District Judge for the Eastern District of Michigan, sitting by designation.

———————————

**COUNSEL**

**ARGUED:**    Bruce B. Elfvin, ELFVIN & BESSER, Cleveland, Ohio, for Appellant.    Richard C. Haber, REMINGER & REMINGER, Cleveland, Ohio, for Appellee. **ON BRIEF:** Bruce B. Elfvin, Barbara Kaye Besser, Amy S. Glesius, ELFVIN & BESSER, Cleveland, Ohio, for Appellant. Richard C. Haber, REMINGER & REMINGER, Cleveland, Ohio, for Appellee.

———————————

**OPINION**

———————————

RYAN, Circuit Judge. This case presents a question of first impression in this court: whether Congress validly abrogated Eleventh Amendment immunity by applying Title II of the Americans with Disabilities Act (ADA) to the States. We hold that it did not and that, as a consequence, we must reverse the district court's judgment for the plaintiff.

Joseph M. Popovich brought three federal claims against the Domestic Relations Division of the Cuyahoga County Court of Common Pleas (DRD), an arm of the State of Ohio, alleging: (1) failure to accommodate his hearing disability, in violation of Title II of the ADA; (2) retaliation, in violation of the ADA; and (3) a 42 U.S.C. § 1983 claim. Popovich's claims arise out of the DRD's alleged failure to provide him with an adequate hearing aid in the course of a prolonged child custody dispute. A jury awarded Popovich $400,000 in compensatory damages and the district court awarded injunctive relief. Despite myriad issues raised on appeal, we need reach only one: whether Congress exceeded its authority in purporting to abrogate Eleventh Amendment immunity under Title II. As we have said, we hold that it did and therefore we will REVERSE the district court's judgment.

impossible for us to conclude that the award was based *solely* on Title II, we must consider whether a verdict under the ADA's retaliation provision can stand. We find that it cannot.

The ADA provides that "[n]o person shall discriminate against any individual because such individual . . . made a charge . . . or participated in any manner in an investigation . . . under this chapter." 42 U.S.C. § 12203(a). To establish a retaliation claim, a plaintiff must show: "(1) that he engaged in protected activity; (2) that he suffered adverse . . . action; and (3) that a causal connection existed between the protected activity and the adverse action." *Penny v. United Parcel Serv.*, 128 F.3d 408, 417 (6th Cir. 1997). Popovich's alleged "protected activity" was the complaint he filed with the DOJ. According to DOJ regulations, "[a]n individual who believes that he or she . . . has been subjected to discrimination on the basis of disability by a public entity may . . . file [such] a complaint." 28 C.F.R. § 35.170(a). Given our holding that the State of Ohio, including the DRD, is immune from suit for "discriminating" in violation of Title II, we hold that Popovich's complaint to the DOJ did not constitute a "protected activity." Therefore, we reverse the district court's judgment entering the jury's award of compensatory damages.

#### 4. *Injunctive Relief*

In closing, we note that the district court did not specify its source of authority for imposing injunctive relief. Thus, it is unclear whether the court was purporting to act under 42 U.S.C. § 1983 or the ADA. In either case, the injunctive relief cannot stand. The DRD was immune from suit under the ADA for the reasons discussed above, and it is not a "person" subject to suit under section 1983. *Mumford*, 105 F.3d at 267.

done so without conducting any new analysis in light of that authority. *See Jackan v. New York State Dep't of Labor*, 205 F.3d 562 (2d Cir. 2000); *Kilcullen v. New York State Dep't of Labor*, 205 F.3d 77 (2d Cir. 2000). In addition, the Fifth Circuit recently acknowledged that *Kimel* may undermine its holding in *Coolbaugh*. *Neinast v. Texas*, 217 F.3d 275, 280 n.29 (5th Cir. 2000).

In summary, we hold that Congress exceeded its enforcement authority under the Fourteenth Amendment in applying Title II to the States. Title II's strict prohibition on discrimination, along with the accommodation requirement, regulates far more conduct than the Equal Protection Clause prohibits. Moreover, the scarce evidence of unconstitutional discrimination by the States in the provision of public services leads us to conclude that Title II was "an unwarranted response to a perhaps inconsequential problem." *Kimel*, 120 S. Ct. at 648-49.

We do not mean to suggest that the problems endured by the disabled are inconsequential. To the contrary, we do not doubt that disabled individuals face considerable obstacles in today's society. There is no question that the ADA is an effective tool for achieving its laudable goals to ensure "equality of opportunity, full participation, independent living, and economic self-sufficiency" for disabled individuals. 42 U.S.C. § 12101(a)(8). But admirable, even desirable goals are not always consistent with constitutional limitations; in such cases, we are bound to follow the constraints of the Constitution.

### 3. *ADA Retaliation*

Unfortunately, a poorly drafted verdict form prevents us from resting our holding entirely on Title II of the ADA, although neither party has identified this fact. The general verdict form permitted the jury to award damages if it found that the defendants had violated Title II "and/or" the ADA's retaliation provision. Since the verdict form makes it

## I.

### A.  *FACTUAL BACKGROUND*

Popovich was divorced in 1985. On August 9, 1990, Popovich's ex-wife Norma Jeńell Whisenant filed a motion with the DRD to enforce her right of companionship with her daughter, a child of her marriage to Popovich. During a hearing on the motion in August 1992, Popovich informed the hearing referee that he was having trouble hearing the proceedings, making his participation difficult. The referee postponed the proceedings to resolve Popovich's concern and ordered him to undergo an audiological examination at his own expense. The exam confirmed that Popovich had mild to moderate hearing loss with no sign of an ear infection or other disease. Based on her examination of Popovich, the audiologist recommended that the court provide an FM amplification system with a pass-around microphone and headphones.

On August 24, 1992, while the custody action was still pending, Whisenant filed a petition of domestic violence requesting a temporary restraining order against Popovich. The next morning, the DRD held an *ex parte* hearing and granted the mother temporary custody of her daughter. The daughter was removed from Popovich's home, and Popovich was prohibited from having any contact with her. On the same day, the DRD held a hearing to consider the results of Popovich's audiological exam. The parties stipulated that Popovich suffered from a hearing impairment that required "speech augmentation equipment." The DRD adopted most of the audiologist's recommendation, agreeing to use an FM amplification system to accommodate Popovich's hearing loss. For security reasons, however, the DRD decided to use a conference-style microphone rather than a so-called "pass-around" microphone. Popovich's counsel acknowledged at the time that this accommodation was satisfactory, and Popovich has not challenged the DRD's decision to use a

conference-style microphone rather than a pass-around microphone.

The DRD declared a mistrial in the custody case on August 27, 1992, and reassigned the case to another judge. Between September 2 and October 23, a referee held hearings on the domestic violence petition. During these hearings, the DRD used the FM amplification system with the centrally located microphone, and Popovich wore headphones.

On October 23, Popovich complained to the referee of an ear infection, claiming it was due to his use of the headphones. Popovich moved for a continuance to allow the infection to clear up. Attached to the motion was a letter from Popovich's physician stating that he had been under a physician's care for an ear infection that was expected to improve in three to four weeks. The referee granted a continuance and requested that Popovich provide the DRD with information from a physician about the ear infection. The deadline for submission of this information was November 5, and the custody hearing was adjourned to December 1, 1992. Popovich, however, provided no further information to the DRD concerning the ear infection or its prognosis.

On December 1, a few minutes before the hearing was to recommence, Popovich filed a motion requesting real-time captioning in the courtroom to accommodate his hearing deficiency. The referee gave Popovich the choice of proceeding with the custody hearing that day using the FM amplification system, or staying the custody hearing and scheduling a later hearing on the motion for real-time captioning. Popovich chose the latter option. A hearing to determine the appropriate accommodation was scheduled for February 1, 1993, but it was canceled due to the referee's illness.

Although Popovich's counsel initially conceded that the FM amplification system was effective, Popovich apparently

impact disabled individuals for benign, constitutional reasons from those specifically intended to disfavor disabled individuals. Congress's failure to recognize this distinction between unconstitutional and constitutional discrimination, and to incorporate it into the statute, leaves the accommodation remedy far out of proportion to any identified constitutional violation.

At best, "Congress appears to have enacted this legislation in response to a handful of instances of state ["discrimination" against the disabled] that do not necessarily violate the Constitution." *Id.* at 2210. Congress's remedial authority does not extend so far. Neither the ADA's legislative history, nor Congress's "findings" embodied in the statute itself, responds to a "history of 'widespread and persisting deprivation of constitutional rights.'" *Id.* (quoting *City of Boerne*, 521 U.S. at 526).

We know that in holding that Congress exceeded its authority by abrogating States' sovereign immunity under the ADA, we depart from the view expressed by several of our sister circuits. *See Martin v. Kansas*, 190 F.3d 1120 (10th Cir. 1999) (upholding Title I as applied to the States); *Muller*, 187 F.3d 298 (2d Cir. 1999) (same); *Kimel v. State Bd. of Regents*, 139 F.3d 1426 (11th Cir. 1998) (same), *aff'd on other grounds*, 120 S. Ct. 631 (2000); *Coolbaugh*, 136 F.3d 430 (5th Cir. 1998) (upholding Title II as applied to the States); *Clark v. California*, 123 F.3d 1267 (9th Cir. 1997) (same). *Cf. Walker v. Snyder*, 213 F.3d 344 (7th Cir. 2000) (holding that Congress exceeded its authority in applying Title II to the States); *Alsbrook v. City of Maumelle*, 184 F.3d 999 (8th Cir. 1999) (*en banc*) (same); *Erickson*, 207 F.3d 945 (7th Cir. 2000) (striking Title I of the ADA as applied to the States). However, all but one of the circuits that have upheld application of the ADA to the States did so before the Supreme Court decided *Kimel*, a decision we believe "changes everything" and compels our holding today. The Second Circuit is the only circuit that has continued to apply the ADA to the States in the aftermath of *Kimel*, and it has

to vote, hold public office, obtain a driver's license or hunting license, serve on juries, and marry).

Congress did include some specific findings in the ADA itself identifying discrimination against the disabled as a "serious and pervasive social problem" and stating that discrimination against the disabled affects "access to public services."  42 U.S.C. § 12101(a)(2)-(3).  In our view, these generalized and unsupported "findings" do not cure the dearth of evidence in the legislative history.  We understand that some courts have been willing to overlook this deficiency and rely on Congress's express finding that discrimination against the disabled is pervasive. *Dare v. California*, 191 F.3d 1167, 1174 (9th Cir. 1999), *petition for cert. filed*, 68 USLW 3566 (U.S. Feb. 24, 2000) (No. 99-1417); *Muller v. Costello*, 187 F.3d 298, 309 (2d Cir. 1999); *Coolbaugh v. Louisiana*, 136 F.3d 430, 437 (5th Cir.), *cert. denied*, 525 U.S. 819 (1998). We disagree with this approach for several reasons.  First, the Supreme Court in *Kimel* rejected the United States' reliance on evidence of substantial age discrimination in the private sector and expressed skepticism as to whether such evidence could be extrapolated to the States. *Kimel*, 120 S. Ct. at 649. Second, the legislative history demonstrates that Title II, in significant part, was designed to achieve consistency between federally funded programs, already covered by the Rehabilitation Act of 1973, and other government programs. *See* S. Rep. No. 101-116, at 12 (1989), *reprinted in* 1 ADA Legislative History; H.R. Rep. No. 101-485, part 2, at 37 (1990), *reprinted in* 1 ADA Legislative History.  This is not an objective compelled by the Constitution.  Congress's desire to provide a "uniform remedy," placing States on the "same footing" as other entities governed by federal law, does not fall within its Fourteenth Amendment enforcement powers. *Florida Prepaid*, 119 S. Ct. at 2211.  Third, the evidence of "discrimination" in the legislative history, like Congress's references to "discrimination" in its statutory findings, is not confined to *unconstitutional* discrimination; for the most part, the isolated evidence of "discrimination" fails to distinguish neutral laws and policies that adversely

had concerns about the DRD's response to his hearing deficiency almost from the beginning.  In late August 1992, well before the ear infection, Popovich filed a charge of discrimination with the Department of Justice (DOJ) concerning the DRD's actions to accommodate his hearing deficiency. The DOJ commenced an investigation. The DRD was notified on December 2, 1992, of the discrimination charge and the DOJ's investigation.

On February 19, 1993, and again on March 24, the DOJ recommended to the DRD that it recommence the custody proceedings.  On May 28, the DOJ sent a letter to the DRD requesting a response to Popovich's discrimination charge. In its response, the DRD stated that Popovich was free to bring any auxiliary aid to the courtroom at his own expense, but it insisted that the DRD had met its obligation to reasonably accommodate Popovich's condition by providing the FM amplification system.

On June 1, 1993, Whisenant filed a motion requesting that the DRD continue the August 1992 *ex parte* order.  The court granted the motion, extending the order over Popovich's objection.

On March 31, *1994*, the DOJ informed the DRD that the DRD could hold an *ex parte* hearing or an informal hearing to determine the appropriate auxiliary aid.  The judge convened a conference four months later to discuss auxiliary aids.  At the conference, Popovich presented evidence of his hearing loss and a severe skin condition in both ear canals.  On October 7, the DRD agreed to order real-time captioning for Popovich. The DRD judge entered an order shortly thereafter allowing Popovich to visit his daughter.  For reasons not apparent to this court, Popovich waited until the summer of 1997 to see his daughter.  His daughter moved in with him on October 31, 1997, despite a state court order prohibiting such living arrangement.

## B.  *PROCEDURAL HISTORY*

Popovich filed his complaint in federal district court on March 23, 1995, and an amended complaint on September 15, 1995.  His amended complaint alleged that the DRD and Cuyahoga County discriminated against him in violation of Title II of the ADA, retaliated against him in violation of the ADA, and violated 42 U.S.C. § 1983.  Popovich claimed that as a result of the defendants' conduct, he was prohibited from seeing his daughter for approximately five years, from the time she was 11 years old until she was 16.

On April 6, 1998, a jury returned a verdict for Popovich, finding that the defendants violated Title II of the ADA and/or retaliated against him in violation of the ADA.  The jury awarded compensatory damages in the amount of $400,000.  The magistrate judge entered the jury's award and, based on the jury's finding, awarded injunctive relief: (1) requiring the defendants to provide real-time captioning for Popovich in the state custody matter; (2) enjoining the defendants from discriminating against him in connection with providing any auxiliary aids; and (3) enjoining the defendants from retaliating against him.  The defendants filed timely post-trial motions for new trial, for judgment as a matter of law, and for remittitur.  The district court granted judgment as a matter of law in favor of Cuyahoga County, but denied the remainder of the requested relief.  The court also denied Popovich's request for pre-judgment interest.

The defendants filed a timely notice of appeal.  Popovich cross-appealed the dismissal of Cuyahoga County and the denial of pre-judgment interest.  However, at oral argument before this court, Popovich withdrew his cross-appeal against the County and waived his right to appeal the pre-judgment interest issue as a matter of law, because his briefs did not address it.  *See Buziashvili v. Inman*, 106 F.3d 709, 719 (6th Cir. 1997).  Therefore, we will consider only the claims against the DRD.

carefully distinguish between valid prophylactic legislation and legislation that substantively alters the scope of constitutional guarantees.  In *Kimel*, the Court made very clear that Congress may overstep its bounds in enacting broad remedial legislation when the legislative history fails to evidence significant constitutional violations requiring such "powerful remedies."  *Kimel*, 120 S. Ct. at 648.

We have thoroughly reviewed the legislative history of the ADA.  Despite its volume, we find that the legislative history of this statute suffers from the same deficiencies the Court identified in *Kimel*.  There is virtually no evidence that the States have engaged in a widespread pattern of *unconstitutional* discrimination against the disabled in the provision of public services.  The only relevant evidence "consists almost entirely of isolated sentences clipped from floor debates."  *Id.* at 649.  *See Oversight Hearing on H.R. 4498, Americans with Disabilities Act of 1988; Hearing Before the Subcommittee on Select Education of the House Committee on Education and Labor*, 100th Cong. 100-109, at 50 (1988) (statement of Ilona Durkin, Connecticut Traumatic Brain Injury Ass'n, Inc.) ("State agencies discriminate against people with traumatic brain injury because of their disability"), *reprinted in* 2 Bernard D. Reams, Jr., *et al.*, Disability Law in the United States: A Legislative History of the Americans with Disabilities Act of 1990 Public Law 101-336 (1992) [hereinafter ADA Legislative History]; and *Americans with Disabilities Act of 1989; Hearings Before the Committee on Labor and Human Resources and the Senate Subcommittee on the Handicapped*, 101st Cong. 101-156, at 658 (1989) (appendix) (prepared statement of Laura Oftedahl, Director of Public Affairs, Columbia Lighthouse for the Blind) (describing barriers to accessing information from public agencies in braille, large-print, recorded, or computer-accessible form), *reprinted in* 2 ADA Legislative History; United States Commission on Civil Rights, Accommodating the Spectrum of Individual Abilities, at 40, 168 (Sept. 1983) (stating that disabled individuals have been denied the right

against disabled individuals; that the absence of an FM amplification system or real-time captioning in the courtroom was due to a discriminatory motive; or that the DRD refused to provide real-time captioning because of Popovich's hearing loss. Popovich, therefore, could not succeed in a claim under the Equal Protection Clause. Title II provided more relief in this case than would otherwise be available under the Fourteenth Amendment.

In this sense, the accommodation requirement under the ADA is reminiscent of the ill-fated RFRA.

> What the RFRA did for religion, the ADA does for disabilities. In neither situation does the Constitution forbid neutral laws or practices that create disparate impacts; in neither situation does the Constitution require accommodation. . . . [Indeed,] there is a countervailing difference that makes the ADA the more adventuresome. The Free Exercise Clause forbids all intentional discrimination against religious practices; the Equal Protection Clause has no similar rule about disabilities. Rational discrimination against persons with disabilities is constitutionally permissible in a way that rational discrimination against religious practices is not. This makes the ADA harder than the RFRA to justify under § 5 . . . . *[N]o one* believes that the Equal Protection Clause establishes the disparate-impact and mandatory-accommodation rules found in the ADA.

*Erickson v. Board of Governors of State Colleges and Univs. for Northeastern Illinois Univ.*, 207 F.3d 945, 951 (7th Cir. 2000), *petition for cert. filed*, 68 USLW 3003 (U.S. June 26, 2000) (No. 99-2077).

This does not end our inquiry, however. The Supreme Court has made clear that Congress has authority under the Fourteenth Amendment to enact broad prophylactic legislation, even if it regulates a substantial amount of conduct that does not run afoul of the Constitution. We must

## II.

### A. *JURISDICTION TO CONSIDER ELEVENTH AMENDMENT IMMUNITY*

We first address the plaintiff's contention that we lack jurisdiction to consider the DRD's Eleventh Amendment argument. The plaintiff maintains that the DRD waived its right to assert this defense by failing to raise the issue earlier in the proceedings. We disagree.

Although the DRD claimed in its amended answer that it is "immune" from liability, its immunity argument before the district court focused solely on judicial immunity. The DRD never explicitly invoked Eleventh Amendment immunity at the district court level, nor did its original appeal brief touch on the issue. The DRD first mentioned the Eleventh Amendment in its reply brief on appeal, and even that reference was cryptic. We certainly do not condone the DRD's late assertion of Eleventh Amendment immunity, but we do not think we are, as a matter of law, foreclosed from considering it. Indeed, for the reasons that follow, we are satisfied that we have discretion to do so.

The Eleventh Amendment immunity defense may be raised for the first time on appeal. *Edelman v. Jordan*, 415 U.S. 651, 678 (1974). We may even consider the issue *sua sponte*. *Estate of Ritter v. University of Michigan*, 851 F.2d 846, 850 (6th Cir. 1988); *State of Ohio v. Madeline Marie Nursing Homes No. 1 and No. 2*, 694 F.2d 449, 459-60 (6th Cir. 1982). Indeed, there is authority in this circuit holding that we *must* consider Eleventh Amendment immunity *sua sponte*. *Wilson-Jones v. Caviness*, 99 F.3d 203, 206 (6th Cir. 1996), *as amended by* 107 F.3d 358, 358-59 (6th Cir. 1997). The plaintiff argues that *Wilson-Jones* is no longer good law in light of *Wisconsin Department of Corrections v. Schacht*, 524 U.S. 381 (1998), in which the Supreme Court stated that a court need not address Eleventh Amendment immunity if the parties do not raise it. *Schacht*, 524 U.S. at 389. While

*Schacht* casts doubt on our holding in *Wilson-Jones*, neither the Supreme Court nor this court has suggested that we lack jurisdiction to consider an Eleventh Immunity defense raised late in the proceedings, or not at all. *See Mixon v. State of Ohio*, 193 F.3d 389, 397 (6th Cir. 1999).

The plaintiff urges us to follow authority from the Ninth and First Circuits holding that a state defendant waives its right to assert Eleventh Amendment immunity by failing to raise it earlier in the proceedings. *See Hill v. Blind Indus. & Servs. of Maryland*, 179 F.3d 754, 756-58 (9th Cir. 1999), *as amended by* 201 F.3d 1186 (9th Cir. 2000); *Torres v. Puerto Rico Tourism Co.*, 175 F.3d 1, 5 (1st Cir. 1999). To the extent that these authorities may stand for the proposition that we lack *discretion* to hear a late Eleventh Amendment defense, we decline to follow them.

At oral argument, the plaintiff also relied on *Cuyahoga Valley Railway Co. v. Tracy*, 6 F.3d 389 (6th Cir. 1993), in arguing that the DRD waived the immunity argument by failing to raise it earlier. That case is distinguishable. In *Cuyahoga*, intrastate railroads challenged Ohio's railroad excise tax. The district court entered summary judgment in favor of the railroads, *and the State of Ohio did not appeal this order*. Several months later, interstate railroads moved to intervene. The court granted the intervention motions and entered a modified summary judgment in favor of the intervenors, limiting the scope of summary judgment to apply only to the original plaintiffs. The State appealed, challenging the order granting intervention and the order modifying summary judgment. As to summary judgment, the State argued that the court's remedy violated the Eleventh Amendment. *Id.* at 394. We held that the State had waived its right to raise this argument by failing to timely appeal the original summary judgment. *Id.* at 395. Here, in contrast, the DRD timely appealed the district court's judgment. Although *Cuyahoga* also recites in a footnote the general rule that we "will not consider arguments raised for the first time on

service, program, or activity." 28 C.F.R. § 35.130(b)(7) (emphasis added). Similarly, with regard to communication aids, the regulations adopt a "fundamental alteration" exception and an "undue financial and administrative burdens" exception. 28 C.F.R. § 35.164. The public entity bears the burden of proving such alteration or burdens "after considering all resources available for use in the funding and operation of the service, program, or activity." *Id.* We note that a plurality of the Supreme Court, in a recent Title II case involving the right of disabled individuals to community-based treatment, has interpreted section 35.130(b)(7) to permit more flexibility than its plain language might suggest. *Olmstead v. Zimring*, 119 S. Ct. 2176, 2188-90 (1999). In *Olmstead*, the Court construed the "fundamental alteration" exception to "allow the State to show that, in the allocation of available resources, immediate relief for the plaintiffs would be inequitable, given the responsibility the State has undertaken for the care and treatment of a large and diverse population of persons with mental disabilities." *Id.* at 2189. However, as we explain below, even this liberal interpretation of one of the accommodation exceptions, like the ADEA's BFOQ defense, imposes a burden on the States that is "'significantly different'" from a rational basis test. *See Kimel*, 120 S. Ct. at 647 (quoting *Western Air Lines, Inc. v. Criswell*, 472 U.S. 400, 421 (1985)).

The accommodation requirement, with its limited regulatory exceptions, reaches far beyond conduct likely to violate the Equal Protection Clause. Accommodation requires special treatment for the disabled in situations where facially neutral policies and practices adversely impact the disabled due to their physical or mental impairments. Such action may be constitutionally required only in cases where the State adopts the challenged policy *because of*, not in spite of, the limitations of the disabled. Title II makes no attempt to distinguish between those neutral policies that violate the Equal Protection Clause and those that do not. This case illustrates the point. There was no evidence that the DRD designed its courtroom with the intention of discriminating

unconstitutional under the applicable equal protection, rational basis standard." *Kimel*, 120 S. Ct. at 647.

We need not rely on the prohibitive component of Title II alone, however, because Title II extends well beyond it. Although Title II's explicit provisions merely *prohibit* public entities from excluding disabled individuals from participating in, or enjoying the benefits of, public services, it contains another implicit requirement. Specifically, Title II defines a "qualified individual with a disability" to mean:

an individual with a disability who, *with* or without *reasonable modifications* to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, *or the provision of auxiliary aids and services*, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

42 U.S.C. § 12131(2) (emphasis added). In effect, this definition imposes an affirmative obligation on public entities to accommodate disabled individuals. It is this obligation that lies at the heart of this case, as Popovich claims that the DRD denied him appropriate auxiliary aids to accommodate his hearing disability.

There is no statutory exception to Title II's duty to accommodate; the only exceptions appear in the enforcing agency's regulations. Even if we were convinced that regulations can save an otherwise invalid statute—and we are not—resort to the regulations in this case is not helpful to the plaintiff. Like the limited statutory exceptions that could not save the ADEA in *Kimel*, the regulatory exceptions in this case result in a scheme that imposes far more restrictions on state action than would be the case under a rational basis standard. For example, the regulations excuse a public entity from the obligation to modify policies, practices or procedures only if the entity "can demonstrate that making the modifications would *fundamentally alter* the nature of the

appeal," *id.* at n.6, it does not limit our discretion to do so in the appropriate case.

We are satisfied that the clear weight of authority is that it is within our discretion to decide when the circumstances merit consideration of a delayed sovereign immunity defense, and we believe it is appropriate to do so in this case for a number of reasons: the importance of the issue; its wide-reaching effect; the substantial uncertainty about the current state of the law; and the fact that, in response to our request the parties have submitted supplemental briefs on the issue.

The availability of Eleventh Amendment immunity under the ADA has split the circuits, and neither the Supreme Court nor this court has tackled the issue to date. *See Pennsylvania Dep't of Corrections v. Yeskey*, 524 U.S. 206, 212-13 (1998); *Nelson v. Miller*, 170 F.3d 641, 647-48 (6th Cir. 1999). The parties in this action, and other parties who may be pursuing or preparing to pursue claims under Title II, deserve our answer to this question. Moreover, because the parties have now fully briefed the issue at our post-hearing direction, the plaintiff has suffered no prejudice from the DRD's failure to raise Eleventh Amendment immunity earlier in the proceedings.

## B. *AVAILABILITY OF ELEVENTH AMENDMENT IMMUNITY*

The Eleventh Amendment states:

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI. The Supreme Court has interpreted this language to mean "that an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State." *Edelman*, 415 U.S. at

663.  An Ohio Common Pleas Court, including the Domestic Relations Division, is "an arm of the state for purposes of . . . Eleventh Amendment immunity analys[i]s." *Mumford v. Basinski*, 105 F.3d 264, 269 (6th Cir. 1997).  Thus, we must decide whether the DRD is immune from suit in federal court.

There are three exceptions to a State's sovereign immunity under the Eleventh Amendment.  First, a State waives the immunity when it consents to suit in federal court.  *See Green v. Mansour*, 474 U.S. 64, 68 (1985); *Nelson*, 170 F.3d at 645-46.  It is undisputed that the DRD has not done so here.  *See Mixon*, 193 F.3d at 397.  Second, the Amendment does not bar a suit against a state official seeking prospective injunctive relief to end a continuing violation of federal law. *Ex parte Young*, 209 U.S. 123, 167 (1908); *Lawson v. Shelby County, Tennessee*, 211 F.3d 331, 335 (6th Cir. 2000).  This exception is also inapplicable, as Popovich no longer asserts any claim against a "state official."

A third exception applies where Congress validly abrogates Eleventh Amendment immunity.  *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 55 (1996); *Nelson*, 170 F.3d at 646. This is the exception at issue here, and we now proceed to consider it.

### 1.  *The Abrogation Exception*

### a.  **Clear and Unequivocal Statement**

As a preliminary matter, we note that Popovich's claim arises under Title II, Part A, of the ADA.  Title II, Part B, of the ADA governs public transportation, and we have not had occasion to consider the provisions of Part B in this case.  We intend our references to the "ADA" in this opinion to refer solely to Title II, Part A, of the ADA.

To determine whether Congress validly abrogated State immunity under Title II of the ADA, we must resolve two issues: (1) "whether Congress unequivocally expressed its intent to abrogate" the immunity; and (2) "if it did, whether

Our comparison of Title II to the Fourteenth Amendment equal protection guarantee leads us to conclude that Title II of the ADA is "'so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior.'" *Kimel*, 120 S. Ct. at 647 (quoting *City of Boerne*, 521 U.S. at 532).  Like the ADEA, Title II of the ADA prohibits a broad swath of conduct without permitting *any* inquiry into the State's legitimate interests.  Indeed, Title II's prohibition on "discrimination" is even more stringent than that under the ADEA, given that the ADEA incorporates statutory exceptions whereas Title II of the ADA does not.  *See Kimel*, 120 S. Ct. at 647.  We agree with the Seventh Circuit's observation that the ADA goes beyond Congress's power under the Constitution in that

> State practices affecting the disabled do not receive the same presumption of legitimacy that they do under rational basis scrutiny. . . .  [U]nder the ADA it is no longer the case that any rational reason will support the State's action.  . . . Moreover, while the Fourteenth Amendment allows the State to make broad generalizations about the disabled, the ADA "starts with a presumption in favor of requiring the [State] to make an individualized determination." . . . .

> As with the [ADEA] discussed in *Kimel*, the ADA shifts the burden in a disability discrimination case from the individual to the State, raises the level of judicial scrutiny from rationality review to a heightened level of scrutiny, and disallows the approximations and generalizations that are permitted for classes that otherwise receive only rational basis protection.

*Stevens v. Illinois Dep't of Transp.*, 210 F.3d 732, 738 (7th Cir. 2000) (quoting *Kimel*, 120 S. Ct. at 647), *petition for cert. filed*, 69 USLW 3022 (U.S. June 30, 2000) (No. 00-7). On this basis alone, we could find that the ADA "prohibits substantially more [State conduct] than would likely be held

Equal Protection Clause are not justifications that necessarily apply in the disability context. For example, the Court noted that "[o]ld age . . . does not define a discrete and insular minority because all persons, if they live out their normal life spans, will experience it." *Kimel*, 120 S. Ct. at 645. However, *Kimel* does nothing to undermine the Supreme Court precedent holding that disability deserves only rational basis scrutiny; we are bound to follow this precedent. Likewise, Congress's characterization of the disabled as a "discrete and insular minority" in the text of the ADA, 42 U.S.C. § 12101(a)(7), cannot override *Cleburne*. This legislative "finding," invoking the buzzwords associated with heightened scrutiny, "evinces an intent not to remedy [conduct that violates the *Cleburne* rational basis standard], but rather to effect a substantive alteration of" *Cleburne*. *Brown v. North Carolina Div. of Motor Vehicles*, 166 F.3d 698, 708 (4th Cir. 1999) (internal quotation marks and citation omitted), *petition for cert. filed*, 68 USLW 3164 (U.S. Sept. 8, 1999) (No. 99-424). As such, the "discrete and insular" finding provides a strong, if inconclusive, clue that Congress was acting outside of its Fourteenth Amendment enforcement authority in applying the ADA to the States.

The Equal Protection Clause does afford some protection to disabled individuals. "[A]rbitrary and irrational discrimination violates the Equal Protection Clause under even [the] most deferential standard of review." *Bankers Life & Cas. Co. v. Crenshaw*, 486 U.S. 71, 83 (1988). On the other hand, a *facially neutral* law or policy that adversely impacts the disabled will violate equal protection only where the law or policy "was promulgated . . . *because of*, not merely in spite of, its adverse impact on" disabled persons. *Horner v. Kentucky High Sch. Athletic Ass'n*, 43 F.3d 265, 276 (6th Cir. 1994) (citing *Personnel Adm'r v. Feeney*, 442 U.S. 256, 279 (1979)). "'"Discriminatory purpose" . . . implies more than intent as volition or intent as awareness of consequences.'" *Horner*, 43 F.3d at 276 (quoting *Feeney*, 442 U.S. at 279).

Congress acted pursuant to a valid grant of constitutional authority." *Kimel v. Florida Bd. of Regents*, 120 S. Ct. 631, 640 (2000). As to the first question—whether Congress unequivocally stated its intent to abrogate the immunity under Title II—there is no question that it did. *See Nelson*, 170 F.3d at 647 n.6. In 42 U.S.C. § 12202, Congress expressly stated: "A State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a violation of" the ADA. *Id.* In addition, Title II's substantive requirements govern the conduct of any "public entity," defined to include "any *State* or local government." 42 U.S.C. § 12131(1)(A) (emphasis added).

**b. Valid Exercise of Constitutional Authority**

The second prong of the abrogation exception—whether, in abrogating the State's Eleventh Amendment immunity, Congress acted pursuant to a valid grant of constitutional authority—is more complicated. We recently explained that this prong involves two inquiries: (1) whether Title II of the ADA was "'passed pursuant to a constitutional provision granting Congress the power to abrogate'"; and (2) "whether the substantive provisions of the ADA are a valid exercise of Congress's [enforcement] power" under the relevant constitutional provision. *Nelson*, 170 F.3d at 648 (quoting *Seminole Tribe*, 517 U.S. at 59). The Supreme Court has made clear that the Commerce Clause is not a source of authority for Congress to abrogate Eleventh Amendment immunity. *Seminole Tribe*, 517 U.S. at 72-73. However, the Court has said that Congress does derive such authority from Section 5 of the Fourteenth Amendment. *Id.* at 59. The Amendment provides, in relevant part:

**Section 1**. . . . No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due

process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

. . . .

**Section 5**.  The Congress shall have power to enforce, by appropriate legislation, the provisions of this article.

U.S. Const. amend. XIV, §§ 1, 5.  Congress invoked Section 5 of the Fourteenth Amendment as one of its sources of authority in enacting the ADA.  42 U.S.C. § 12101(b)(4).  Thus, Title II was "passed pursuant to a constitutional provision granting Congress the power to abrogate." *Nelson*, 170 F.3d at 648.

The current debate over Eleventh Amendment immunity focuses not on the *source* of Congress's abrogation authority, but the scope of that authority.  *See id.*  Over the past three years, the Supreme Court has addressed the scope of Congress's enforcement authority under the Fourteenth Amendment on several occasions.  *See Kimel*, 120 S. Ct. 631; *Florida Prepaid Postsecondary Educ. Expense Bd. v. College Sav. Bank*, 119 S. Ct. 2199 (1999); *College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666 (1999); *City of Boerne v. Flores*, 521 U.S. 507 (1997).  This jurisprudence guides our analysis, and we pause to summarize its most salient features.

Congress's enforcement power under the Fourteenth Amendment "includes the authority both to remedy and to deter violation of rights guaranteed thereunder by prohibiting a somewhat broader swath of conduct, including that which is not itself forbidden by the Amendment's text." *Kimel*, 120 S. Ct. at 644.  On the other hand, authority to determine "'what constitutes a constitutional violation'" resides solely with the courts—not with Congress.  *Id.* (emphasis omitted) (quoting *City of Boerne*, 521 U.S. at 519).  In other words, "Congress does not enforce a constitutional right by changing what the right is." *City of Boerne*, 521 U.S. at 519.  The Court has acknowledged that this simple distinction is not

### 2. *Title II of the ADA*

As we have said, because it is clear that Congress satisfied the first prong of the abrogation exception by clearly and unequivocally stating its intent to abrogate Eleventh Amendment immunity under the ADA, our task is to decide whether, in doing so, Congress exceeded its authority to enforce the Fourteenth Amendment.  Although the statutes involved in *Kimel* and *City of Boerne* are distinguishable in several respects from the ADA, these distinctions are not sufficient to protect Title II from the fate that befell the RFRA and the ADEA.  Indeed, we believe that the ADA shares attributes with both the RFRA and the ADEA that make this law even more difficult to justify under Section 5 of the Fourteenth Amendment.

To apply the "congruence and proportionality" test, we first must identify the "unconstitutional conduct that conceivably could be targeted by the [ADA]." *Kimel*, 120 S. Ct. at 645.  Title II provides, in relevant part:

no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132.  Thus, Title II is designed to protect disabled persons, as defined under the statute.  *See id.* § 12131(2).

It is well established that disability is not a suspect class for purposes of equal protection analysis.  *Heller v. Doe*, 509 U.S. 312, 321 (1993); *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 441-47 (1985); *see also Bartell v. Lohiser*, 215 F.3d 550, 559 (6th Cir. 2000).  The State may discriminate on the basis of disability if such classification is rationally related to a legitimate state interest.  We recognize that the reasons identified in *Kimel* as to why age-based classifications do not deserve heightened scrutiny under the

problem of constitutional dimension requiring prophylactic legislation. *Id.* at 648-49. As it had in *City of Boerne*, the Court relied on the legislative history as a means to evaluate whether a significant evil justified Congress's strong remedial measures. *Id.* at 648; *see also Florida Prepaid*, 119 S. Ct. at 2207-11.

> Our examination of the ADEA's legislative record confirms that Congress' 1974 extension of the Act to the States was an unwarranted response to a perhaps inconsequential problem. Congress never identified any pattern of age discrimination by the States, much less any discrimination whatsoever that rose to the level of constitutional violation. The evidence compiled by petitioners to demonstrate such attention by Congress to age discrimination by the States falls well short of the mark. That evidence consists almost entirely of isolated sentences clipped from floor debates and legislative reports.

*Kimel*, 120 S. Ct. at 648-49. The Court rejected the petitioners' reliance on Congress's findings of age discrimination in the private sector, reiterating Congress's failure "to identify a widespread pattern of age discrimination by the States." *Id.* at 649.

The Court concluded:

> In light of the indiscriminate scope of the Act's substantive requirements, and the lack of evidence of widespread and unconstitutional age discrimination by the States, we hold that the ADEA is not a valid exercise of Congress' power under § 5 of the Fourteenth Amendment.

*Id.* at 650.

easy to apply. "[T]he determination whether purportedly prophylactic legislation constitutes appropriate remedial legislation, or instead effects a substantive redefinition of the Fourteenth Amendment right at issue, is often difficult. The line between the two is a fine one," and Congress has "'wide latitude'" in deciphering that line. *Kimel*, 120 S. Ct. at 644 (citations omitted). To aid courts in this delicate analysis, the Supreme Court has adopted the following principle: Congress properly exercises its Fourteenth Amendment enforcement authority where there is "'a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end.'" *Id.* (quoting *City of Boerne*, 521 U.S. at 520).

Two recent Supreme Court cases illustrate the application of the "congruence and proportionality" test. The Court first adopted the test in *City of Boerne*, 521 U.S. 507. There the Court held that Congress exceeded its authority under the Fourteenth Amendment in enacting the Religious Freedom Restoration Act of 1993 (RFRA). The RFRA prohibited governments, including States, from "'substantially burden[ing]' a person's exercise of religion even if the burden results from a rule of general applicability unless the government can demonstrate the burden '(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.'" *Id.* at 515-16 (citations omitted). The proponents of the RFRA argued that the statute's focus on the effects of a challenged ordinance, rather than deliberate or overt discrimination, fell within Congress's power under the Fourteenth Amendment to prevent and remedy constitutional violations. *Id.* at 517.

In applying the "congruence and proportionality" test, the Court looked to the legislative history for evidence of conduct violating the Fourteenth Amendment—in other words, evidence of "generally applicable laws passed because of religious bigotry." *Id.* at 530. The RFRA's legislative history is devoid of such evidence. In fact, the legislative history

indicates that "Congress' concern was with the incidental burdens imposed," rather than the "object or purpose of the [challenged] legislation." *Id.* at 531. The lack of evidence of a constitutional violation, however, was not the RFRA's "most serious shortcoming." *Id.* The Court concluded:

> RFRA is so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior. It appears, instead, to attempt a substantive change in constitutional protections. Preventive measures prohibiting certain types of laws [or conduct] may be appropriate when there is reason to believe that many of the laws [or conduct] affected by the congressional enactment have a significant likelihood of being unconstitutional. . . .
>
>     RFRA is not so confined.

*Id.* at 532.

While Popovich's case was pending, the Supreme Court extended its Eleventh Amendment jurisprudence in *Kimel*, 120 S. Ct. 631, a case that is analogous in many respects to this case. In *Kimel*, several groups of plaintiffs filed suit against their State employers claiming protection under the Age Discrimination in Employment Act (ADEA). After finding that Congress had unequivocally expressed its intention to apply the ADEA to the States, the Court proceeded to apply the "congruence and proportionality" test and held that Congress exceeded its authority to abrogate Eleventh Amendment immunity in applying the ADEA to the States. *Id.* at 637.

The Court began its analysis by observing that age is not a suspect classification under the Equal Protection Clause. *Id.* at 646. Thus, a State "may discriminate on the basis of age" if age is "rationally related to a legitimate state interest." *Id.* This, of course, is a fairly low hurdle to clear. The Court "'will not overturn [government conduct] unless the varying

treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the [government's] actions were irrational.'" *Id.* (quoting *Vance v. Bradley*, 440 U.S. 93, 97 (1979)). It makes no difference that age is an imperfect proxy for characteristics relevant to the State's legitimate interests. *Id.* The Constitution "permits States to draw lines on the basis of age when they have a rational basis for doing so at a class-based level, even if it 'is probably not true' that those reasons are valid in the majority of cases." *Id.* at 647.

The Court then evaluated the substantive provisions of the ADEA against the backdrop of the Fourteenth Amendment requirements. The ADEA prohibits employers from discriminating on the basis of age, with only a few narrow exceptions. The Court found that the law, "through its broad restriction on the use of age as a discriminating factor, prohibits substantially more state employment decisions and practices than would likely be held unconstitutional under the applicable equal protection, rational basis standard." *Id.* The Court also rejected the petitioners' reliance on the statutory exceptions under the ADEA, reasoning that even with those exceptions the law restricted the States' conduct far more than the rational basis test. *Id.* For example, the "bona fide occupational qualification" (BFOQ) exception imposed a burden on the employer to prove "reasonable necessity" for using an age classification, which the Court described as "a far cry from the rational basis standard we apply to age discrimination under the Equal Protection Clause." *Id.* The Court concluded that the ADEA was "'so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior.'" *Id.* (quoting *City of Boerne*, 521 U.S. at 532).

The Court also recognized Congress's power to enact prophylactic legislation. *Id.* at 648. The Court held, however, that the ADEA was not properly characterized as remedial because Congress did not have evidence of a significant